No. 13-56818

IN THE
UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

FOX BROADCASTING COMPANY, TWENTIETH CENTURY FOX FILM
CORP., AND FOX TELEVISION HOLDINGS, INC.,

Plaintiffs-Appellants,

v.

DISH NETWORK L.L.C., DISH NETWORK CORP., AND ECHOSTAR
TECHNOLOGIES, L.L.C.

Defendants-Appellees.

On Appeal from the United States District Court
for the Central District of California
Case No. 12-cv-04529-DMG (SHx)
District Judge Dolly M. Gee

**BRIEF OF LAW SCHOLARS AND PROFESSORS AS *AMICI CURIAE* IN
SUPPORT OF DEFENDANTS-APPELLEES**

Scott G. Seidman
TONKON TORP LLP
888 SW 5th Avenue, Suite 1600
Portland, OR  97204
(503) 802-2021
Attorney for *Amici Curiae*

# TABLE OF CONTENTS

Page(s)

I.    Interest of Amici Curiae. ...............................................................1

II.   Summary of Argument. ..................................................................1

III.  Argument. ....................................................................................4

    A.    Granting A Preliminary Injunction Would Delay The Development Of Technology That Expands Consumer Use Consistent With Supreme Court And Ninth Circuit Precedent. ....................................................4

    B,    The District Court was Correct to Deny a Preliminary Injunction Since the Sling Technology Would Be Protected As Fair Use. ............8

        1.    The Sling Technology Permits Time and Place Shifting Consistent With Supreme Court and Ninth Circuit Precedent. 10

        2.    Consistent With The District Court's Finding Of No Irreparable Injury, There Is No Evidence That The Sling Technology Poses Harm To A Potential Market To Which Fox Is Entitled. ......... 13

IV.   CONCLUSION........................................................................... 19

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*American Geophysical Union v. Texaco, Inc.,*
  60 F.3d 913 (2d. Cir. 1995)...................................................... 11

*Bill Graham Archives v. Dorling Kindersley, Ltd.,*
  448 F.3d 605 (2d Cir. 2006)............................................ 11, 14, 17

*Castle Rock Entmt, Inc. v. Carol Publ'g Grp. Inc.,*
  150 F.3d 132 (2d Cir. 1998)...................................................... 18

*Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.,*
  654 F.3d 989 (9th Cir. 2011) ......................................................7

*Fox Broadcasting Co., Inc. v. DISH Network, LLC,*
  723 F.3d 1067 (9th Cir. 2013) ................................................ 11

*In re Amister (Recording Indus. Ass'n of Am. v. Diamond Multimedia Sys., Inc).,*
  180 F.3d 1072 (9th Cir. 1999) ....................................................4

*Oakland Tribune, Inc. v. Chronicle Pub. Co., Inc.,*
  762 F.2d 1374 (9th Cir. 1985) ....................................................7

*Perfect 10, Inc. v. Amazon.com, Inc.,*
  508 F.3d 1146 (9th Cir. 2007) .................................................. 16

*Perfect 10, Inc. v. Google, Inc.,*
  653 F.3d 976 (9th Cir. 2011) ......................................................7

*Ringgold v. Black Entertainment Television, Inc.,*
  126 F.3d 70 (2nd Cir. 1997)...................................................... 18

*Sega v. Accolade,*
  977 F.2d 1510 (9th Cir. 1992) .................................................. 17

*Sony Corporation of America v. Universal City Studios, Inc.,*
  464 U.S. 417, 104 S. Ct. 774 (1984)....................................... passim

STATUTES

17 U.S.C. § 107 ................................................................. 10

OTHER AUTHORITIES

Fed. R. App. P. 29(a) ........................................................ 1

FRAP 29(c)(5) ................................................................. 1

*Nimmer* § 13.05[A] [4], at 13–189 .................................. 18

## I.    INTEREST OF AMICI CURIAE.[1]

Amici are law professors and scholars who teach, write, and research in the area of intellectual property and technology. *Amici* have an interest in this case because of their interest in the sound development of intellectual property law and because of its potential impact on copyright fair use, including private noncommercial time-shifting and place-shifting of television programs. Resolution of the fair use issues has far-reaching implications for the scope of copyright protection, a subject germane to Amici's professional interests and one about which they have great expertise. A complete list of individual *amici* is attached as Exhibit 1.

*Amici* respectfully submit this brief with the consent of all parties. Fed. R. App. P. 29(a).[1]

## II.    SUMMARY OF ARGUMENT.

Enjoining DISH's implementation of the time and place shifting technology (the "Sling Technology") would undermine the purpose of copyright law to foster progress through the creation and distribution of original content to consumers. The Sling promotes copyright's purpose in

---

[1] Pursuant to FRAP 29(c)(5), *amici* state that no party's counsel authored the brief in whole or in part or contributed money that was intended to fund preparing or submitting the brief.

1

two ways: (1) it promotes legally protected access to copyrighted content by expanding consumer choices in when, how, and where broadcast programming can be viewed, a practice the Supreme Court expressly found to be fair use and socially beneficial in the landmark *Sony Corporation of America v. Universal City Studios, Inc.*, 464 U.S. 417, 104 S. Ct. 774 (1984), decision; and (2) by allowing users to access their broadcast content by sending it through the Internet to the myriad existing connection devices, the Sling Technology promotes efficiency through the convergence of communications and information platforms and markets.

Amici present two arguments in support of affirming the district court's denial of a preliminary injunction. These two arguments emphasize the goals of technological innovation that benefit consumers and support the creation of original content through platforms that make use of communication technologies, such as the Internet.

First, copyright law is designed to promote not only creative content but also technological innovation. Thus, Fox's unnecessary and unreasonable delay in seeking an injunction against DISH undermines both the argument that Fox has suffered irreparable injury and also the incentives to invest in new technology. If copyright owners can seek injunctions years after innovators have dedicated resources to research and development,

2

testing, and distribution in the marketplace, then fewer innovations are likely to occur. Rather, any injury that Fox might have suffered is the result of its waiting to file suit against DISH and the Sling Technology. While Fox waited, DISH and other competitors developed the Sling and similar technologies allowing an array of choices for broadcast, cable, and satellite viewers. Fox waited to sue while the market evolved. It should not be allowed to slow the technological clock and stifle innovation.

Second, Fox's claims for irreparable injury rest on an assumption that as a copyright owner, it was entitled to capture the value of emerging markets that capitalized on new uses of copyrighted content. Such claims illegitimately expand the scope of Fox's entitlement as copyright owner. To conclude that Fox is injured by its alleged loss to licensing and advertising revenues from DISH's marketing and distribution of the Sling Technology would ignore the fair use rights of DISH subscribers in time and place shifting. Fox's alleged economic injuries ignore the competitive and innovative technologies that support copyright, consistent with its goals of promoting progress that benefits consumers and technology innovators. The district court was correct in rejecting Fox's claims for irreparable injury.

Amici urge this court to be mindful of the dynamism of the market for communication and information technologies. Without undermining the

3

entitlements of copyright owners, this court can affirm the district's court denial of Fox's preliminary injunction motion. Such affirmance is consistent with the goals of copyright law and the emerging convergence of communications and information technologies and markets.

## III.   ARGUMENT.

### A.   Granting A Preliminary Injunction Would Delay The Development Of Technology That Expands Consumer Use Consistent With Supreme Court And Ninth Circuit Precedent.

Sling Media launched the Sling Technology in 2005, seven years before the initiation of this litigation by Fox Broadcasting against DISH Network. Owner of several dozen patents covering the technology embodied in the Sling, Sling Media has developed a device that permits cable and satellite subscribers to watch legally acquired television programs at a different place than the moment the show is transmitted to the user's cable box or satellite dish. Both the time shifting and place shifting made possible through the Sling Technology are legally protected fair use. *See Sony v. Universal*, 464 U.S. at 442 (time shifting as fair use); *In re Amister (Recording Indus. Ass'n of Am. v. Diamond Multimedia Sys., Inc).*, 180 F.3d 1072, 1078 (9th Cir. 1999) (place shifting "is paradigmatic non-commercial personal use entirely consistent with the purposes of the [Copyright] Act").

4

The Sling Technology is a combination of hardware and software implemented by users in conjunction with a cable box or satellite dish. It does not use any centralized systems operated by Sling Media. Instead, the Sling Technology permits the capture of a purely functional signal, not subject to copyright protection, and its remote viewing by the user through the Internet. What the Sling Technology permits is user control of access to television broadcast content through the use of specialized hardware and software and an individualized cable box or satellite dish.

What follows from this description, drawn heavily from the record and set forth more fully in DISH's brief, is a demonstration of how the Sling Technology has evolved within a short period of time to promote consumer use and to integrate established forms of television broadcast with the new communications platforms made possible by the Internet and wireless technologies. Amici also emphasize that the fast evolution of the Sling Technology and its practical uses unleashed by DISH are part of a longer evolution of technology initiated by the development and market introduction of the video cassette recorder in the 1970's. Sony's invention launched a path of technological development that promoted new innovations like the DVR and DISH Anywhere permitting communications and broadcast technologies to converge. This path of technological

5

development was made possible by the judicial recognition that such technologies should flourish free of copyright infringement liability. This freedom from judicial intervention included the denial of injunctive relief causing uncertainty for innovators in the promotion of new technologies and their uses.

A grant of a preliminary injunction against DISH Network would cause unnecessary delay in the development of a valuable technology, creating uncertainty for innovators and denying demonstrated benefits to consumers, who themselves would be foreclosed from their own innovations. *See, e.g.*, http://www.amazon.com/Democratizing-Innovation-Eric-Von-Hippel/dp/0262720477. Enjoining DISH Network's marketing and distribution of the varied uses of the Sling Technology would also reward Fox for its delay in initiating its litigation against DISH Networks. Although Amici argue that Fox's claims against DISH will not ultimately succeed on the merits, earlier initiation of the lawsuit by Fox would have permitted a dismissal of Fox's claims with the possibility of fruitful licensing or pooling agreements among the litigants and continued technology development by DISH. Instead, Fox waited while the Sling Technology evolved through the efforts of DISH Network, allowing DISH's innovations to be implemented and available to both consumers and

6

innovators. Rewarding such delay has a potential chilling effect on innovation as copyright owners wait for innovative uses to be enjoyed by consumers and realized by innovators before swooping in with copyright claims of questionable merit. The district court was correct to deny a preliminary injunction because of the equities involved in the harm to the public interest and the positive incentives to creation and invention consistent with copyright and other intellectual property laws. The district court held that absence of irreparable injury supports denial of a preliminary injunction. See Order re: Plaintiff's Motion for Preliminary Injunction at 7. *Accord, Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.*, 654 F.3d 989, 995-6 (9th Cir. 2011) (no presumption of irreparable injury); *Oakland Tribune, Inc. v. Chronicle Pub. Co., Inc.*, 762 F.2d 1374, 1376 (9th Cir. 1985) (plaintiff must demonstrate significant threat of irreparable injury to obtain preliminary injunction). [2]

---

[2] Preliminary injunctions are extraordinary remedies, which necessitate findings of irreparable harm. In the Ninth Circuit, a plaintiff seeking a preliminary injunction must establish in addition to irreparable harm that: (1) he is likely to succeed on the merits, (2) the balance of equities tips in his favor, and (3) an injunction is in the public interest. *See Perfect 10, Inc. v. Google, Inc.*, 653 F.3d 976, 979 (9th Cir. 2011). It is the position of Amici that these factors weigh in favor of Dish and against a granting of a preliminary injunction.

Fox's delay in initiating a lawsuit against DISH, which has been developing the Sling Technology since 2009, indicates that there was no irreparable injury from the implementation of Sling and its use by DISH subscribers. Many of the alleged harms that Fox has identified as stemming from DISH's marketing and distribution of DISH Anywhere would, hypothetically, have arisen when the Sling Technology was invented and sold by Sling Media, starting in 2005. Fox's unreasonable delay negates any arguments in favor of grant of a preliminary injunction against DISH. Any alleged injury suffered by Fox is a result of its failure to enforce its copyright infringement claims against DISH in a timely manner.

Because of the disruption to technological development in rapidly changing convergent communications and broadcast markets and Fox's unreasonable delay, the district court's denial of a preliminary injunction should be upheld.

**B.    The District Court was Correct to Deny a Preliminary Injunction Since the Sling Technology Would Be Protected As Fair Use.**

In order to meet its burden on proving irreparable injury, Fox alleged five types of economic injury caused by the marketing and use of the Sling Technology: (1) harm to licensing agreements with other providers; (2) loss of revenue from providers of remote viewing and digital downloads; (3) loss

of control over its copyrighted works; (4) increased risk of privacy and security threats; and (5) substantial loss of advertising revenue and harm to Fox's ability to negotiate with advertisers. The district court correctly rejected all of these bases for establishing irreparable injury. Fox's claims for irreparable injury assume that as a copyright owner, the broadcast company has the right to economic gains from all potential uses of copyrighted works. These claims ignore statutory and policy limitations on the rights of a copyright owner. Because Fox's claims for irreparable injury expand the entitlement of a copyright owner, the district court should be upheld.

Specifically, Fox's claims for irreparable injury ignore fair use, negating a likelihood of success on the merits in Fox's favor. Because the conduct at issue in this case is performed by the users of the Sling Technology as embodied in DISH's system, it is protected time and place shifting. Furthermore, consistent with the district court's conclusion that Fox has not suffered irreparable injury is the lack of any evidence that DISH has harmed a potential market for Fox's copyrighted works by implementing and expanding the Sling Technology. In conclusion, a preliminary injunction is not warranted because the presence of fair use in conjunction

9

with the benefits of the Sling Technology and Fox's delay in bringing this litigation negate any claims by Fox in favor of injunctive relief.

**1.     The Sling Technology Permits Time and Place Shifting Consistent With Supreme Court and Ninth Circuit Precedent.**

The Copyright Act declares unambiguously that "fair use of a copyrighted work . . . is not infringement. 17 U.S.C. § 107. It further identifies four factors to be considered when determining whether a particular unauthorized use qualifies as a fair use under the Copyright Act: (1) the purpose and character of the use, including whether such use is of a commercial nature; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use on the potential market for or value of the copyrighted work. 17 U.S.C. §107. Analysis of these factors demonstrates that the use of the Sling Technology constitutes fair use and therefore that the district court was correct in its denial of a preliminary injunction.

The initial inquiry in the fair use analysis is the purpose and character of the use. In *Sony*, the Supreme Court expressly held that the private non-commercial purpose of time-shifting favored a finding of fair use. 464 U.S. at 442. Use of the Sling technology here is indistinguishable from the use of

the Sony Betamax. As Judge Gee observed in *Fox Broadcasting v. DISH Network*, this is a modern version of Sony, "fast-forward[ed]" to keep pace with current technology. *Fox*, 2012 WL 5938563 *1.

In response, Fox contends that the conduct by DISH subscribers at issue here is somehow commercial because the users avoided paying a fee through a licensing arrangement with respect to the copyrighted work. This avoidance of a fee, Fox argues, constitutes a commercial use.

Fox's argument is without merit for two reasons. First, courts have consistently held that exploitation of copyrighted material for private enjoyment is a noncommercial, nonprofit activity. *See, e.g., Fox Broadcasting Co., Inc. v. DISH Network, LLC*, 723 F.3d 1067, 1075-76 (9th Cir. 2013). Moreover, the courts have also held that copyright owners are explicitly prohibited from capturing the commercial value of fair uses. *See Bill Graham Archives v. Dorling Kindersley, Ltd.,* 448 F.3d 605, 614-615 (2d Cir. 2006). Fox attempts to rewrite this limitation on the rights of copyright holders through a tortured interpretation of *American Geophysical Union v. Texaco, Inc.*, 60 F.3d 913, 922 (2d. Cir. 1995). This argument not only ignores the *Sony* and *Bill Graham* precedents but also the facts of the *Texaco* case, where the defendant was a commercial enterprise that exploited the copyrighted journal articles for direct commercial gain. *Id.* at 915 (". . .

11

Texaco employs 400 to 500 research scientists, of whom all or most presumably photocopy scientific journal articles to support their Texaco research"). There is no evidence here that DISH subscribers who make use of the Sling Technology are doing anything other than privately viewing television programs that Fox broadcasts. They are not acting any differently from users of the VCR or the DVR—uses that have consistently been held noncommercial.

Second, Fox's argument is without merit because the underlying work is broadcasted to the public over the airwaves, and shifting the program for viewing at a different time or place "merely enables a viewer to see such a work which he had been invited to witness in its entirety free of charge." *Sony*, 464 U.S. at 449. Indeed, time-shifting in this context has been deemed to "yield societal benefits," *Sony*, 464 U.S. at 454, and such benefits are noncommercial in the fair use analysis. It cannot be disputed that just like the VCRs in *Sony*, the uses of the Sling Technology by DISH subscribers are not being distributed, sold or exploited in any way other than for the consumer.

It is telling to note that Fox is developing its own digital service that it distributes online for free. Furthermore, at the time DISH launched its services, there were several companies, such as TiVo, that provide similar

12

time-shifting and place-shifting services. In other words, an active market

promoting and supporting legitimate fair use by satellite and cable viewers

has developed prior to DISH's entry.   DISH raised these arguments before

the district court, which doubted that any injury suffered by Fox "would be

uniquely caused by [DISH's services] in light of the many remote viewing

services already on the market." In conclusion, Fox cannot claim injury for

consumer demand resulting from uses legitimately protected by copyright.

> **2.** **Consistent With The District Court's Finding Of No Irreparable Injury, There Is No Evidence That The Sling Technology Poses Harm To A Potential Market To Which Fox Is Entitled.**

The fourth factor to consider in the fair use analysis is the effect of the

use on the potential market for or value of the copyrighted work.  In its

argument in favor of irreparable injury, Fox's analysis of market harm is

simplistic, formulaic and based on the circular notion that because a market

exists for the right to license copies of its programs for time-shifting, the

DISH subscribers' copies harm Fox's opportunity to negotiate a value for all

uses of those copies.  Through its arguments, Fox asks this Court to ignore

the purpose of fair use:  permitting unlicensed copying, performance,

display, and the like, of copyrighted materials.  Fox invites the Court to

consider the existence of a potential licensing market as countering a finding

of fair use.  This argument is a circular one of the kind rejected by the

13

Second Circuit as impermissible in the fair use analysis.  It is a well-settled copyright principle that "a copyright holder cannot prevent others from entering fair use markets by merely developing or licensing a market for parody, news reporting, education or other transformative uses of its own creative work." *Bill Graham*, 448 F.3d at 614-615 (internal quotations omitted).  Notwithstanding, Fox emphatically advances two arguments: (1) that DISH subscribers' use of the Sling Technology harms their opportunity to negotiate a value for both space- and time-shifting; and (2) that the Sling Technology as embodied in DISH Anywhere features directly compete with "licensed, on-demand and commercial free offerings."  With respect to the Fox's first argument, any claim of serious market or licensing harm is belied by the fact that consumers' use of the Sling Technology to watch programs is time-shifting—a use which has been considered fair use for nearly three decades. Nevertheless, Fox makes a series of predictions about the harm it will suffer if the copies are found to be fair use. Those predictions are as rife with speculation as they were when they were first made in Sony.

Indeed, the copyright holders in Sony were similarly concerned that use of the Betamax would pass "invisible boundaries" and that "copyright owner[s] [would lose] control over [their] program[s]." Sony, 464 U.S. at 451. As to potential future harm in particular, the copyright holders in Sony

14

argued that time-shifting would reduce the number of consumers who watched programs live, would result in the reduction of advertising revenue, would cause a decrease in the amount of rerun viewership, and would damage theater or film rental viewership. Id. at 453. The Supreme Court concluded that none of these arguments established a concrete future harm. Id. at 454. Thus, the Supreme Court concluded that the harm from the fair use of time-shifting, whether authorized or unauthorized, was "speculative and, at best, minimal." Id. at 454.

In the twenty-eight years since *Sony*, while a falling sky is still the centerpiece of the potential harm claimed by Fox, the passage of time has not made that prediction any less speculative. Fox's arguments that "DISH's ad-skipping" feature will cause Fox to lose control over its copyrighted works or that DISH Anywhere will impact what advertisers will pay for air time on broadcast networks, or that the Sling Technology threaten[s] to disrupt Fox's non-television businesses such as Internet streaming, are rank speculation. As noted above, if Sling were harmful to Fox, one might expect some evidence of this to have emerged in the eight years since it hit the market.

Correctly, the district court addressed the speculative nature of Fox's arguments by readily rejecting them. If there is not a demonstrable harmful

15

effect, then there is no reason to prohibit the use. Such a prohibition "would merely inhibit access to ideas without any countervailing benefit." *Sony*, 464 U.S. at 450–51; *see, also, Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1168 (9th Cir. 2007) (concluding that since the district court had made no finding that downloaded thumbnails were being used on cellphones, market harm to copyright owner selling images for cellphones was hypothetical).

In their second argument for market harm, the Fox parties advance that the secondary market for time-shifting in a different medium did not exist at the time of the 1984 *Sony* decision and as such, the language of *Sony* suggests that the existence of such a market would have altered the analysis in that case. Fox's argument is speculative on how the existence of such a secondary market would have affected the Supreme Court's nearly thirty-year-old precedent. Not only does Fox's argument lack empirical support, it also ignores the benefits of consumer choice and convenience made possible by time-shifting and advanced technologies. Assuming arguendo that a market harm exists, the harm would need to be weighed against the benefits of allowing companies and users to unlock new technologies in assessing the fourth factor in the fair use analysis. The Ninth Circuit clearly articulated market competition goals:

16

> In any event, an attempt to monopolize the market by making it impossible for others to compete runs counter to the statutory purpose of promoting creative expression and cannot constitute a strong equitable basis for resisting the invocation of the fair use doctrine. *Sega v. Accolade*, 977 F.2d 1510, 1536 (9th Cir. 1992).

The Second Circuit formulated this point more succinctly in its *Bill Graham Archives* decision: "[C]opyright owners may not preempt exploitation of transformative markets." 448 F.3d at 614-15. Fox's argument, if accepted, would mean that only copyright owners in television content would be able to develop and market time-shifting technologies. This result would not be consistent with the competitive values against which copyright exists.

Furthermore, Fox's argument exhibits a circularity that the Second Circuit rejected after its controversial decision in *Texaco*, 60 F.3d at 918. In that case, the majority concluded, using circular reasoning, that the fourth fair use factor did not support a finding of fair use because Texaco could have obtained a license from the Copyright Clearance Center (CCC) to allow its research scientists to make copies of articles published by American Geophysical. The dissent criticized this reasoning as circular since fair use constitutes an unlicensed use. *Id.* at 937 (Jacobs, J., dissenting). The possibility of obtaining a license does not mean that an alleged infringer must obtain one. This reasoning would effectively nullify fair use, since in theory it may always be possible to obtain a license under some negotiated

17

terms. The fair use doctrine, however, presumes that there are some uses of

copyright that can be undertaken without the need for a license.

The Second Circuit squarely addressed the circularity issue in

*Ringgold v. Black Entertainment Television, Inc.*, 126 F.3d 70, 81 (2nd Cir.

1997), where it wrote:

> We have recognized the danger of circularity in considering
> whether the loss of potential licensing revenue should weight
> the fourth factor in favor of a plaintiff. See *American
> Geophysical*, at 929 n. 17, 931. Since the issue is whether the
> copying should be compensable, the failure to receive licensing
> revenue cannot be determinative in the plaintiff's favor. *See id.*
> at 931. We have endeavored to avoid the vice of circularity by
> considering "only traditional, reasonable, or likely to be
> developed markets" when considering a challenged use upon a
> potential market. *See id.* at 930; *Nimmer* § 13.05[A] [4], at 13–
> 189.

*Id.* at 82; *See also, Castle Rock Entmt, Inc. v. Carol Publ'g Grp. Inc.*, 150

F.3d 132, 145 (2d Cir. 1998).

As the district court correctly concluded here, Fox's claims of market

harm are based on speculation. The copyright owner has failed to establish

what traditional, reasonable, or likely to be developed markets have been

harmed. To say that a user could have licensed the use in question does not

mean that he was legally required to license the use or that he should

negotiate a license. This reasoning would eviscerate fair use from the

Copyright Act. Fox's arguments do not take into consideration the role of

fair use in protecting consumer uses that enhance the functionality of a copyrighted work by potentially expanding the value to users of expressive and communicative aspects of the work or the long-standing precedent that protects against the arguments it is advancing. Time-shifting and place-shifting through technologies like DISH's implementation of the Sling Technology expand the audience for an expressive work of authorship by permitting users to expand access to the work. Consequently for these reasons, this Court should reject Fox's arguments and uphold the lower court's decision.

## IV.   **CONCLUSION**

Reversal of the district court's ruling against Fox would reward the broadcast company's delay in initiating its litigation against DISH and grant to the copyright owner an entitlement that is broader than what is legally protected. The district court correctly found against Fox's claims of irreparable injury. As a result, a preliminary injunction was correctly denied. Fox's claims contradict the use rights of DISH's subscribers and the development of a convergent communications and information market for

platforms to legally download and view television broadcasts.  In light of

these policies, the district court should be affirmed.

Dated: February 21, 2014.


                                        Respectfully submitted,


                                        /s/ Scott G. Seidman
                                        Scott G. Seidman
                                        TONKON TORP LLP
                                        888 SW 5th Avenue, Suite 1600
                                        Portland, OR  97204
                                        (503) 802-2021

## CERTIFICATE OF COMPLIANCE

I certify that, pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), the foregoing **BRIEF OF LAW SCHOLARS AND PROFESSORS AS *AMICI CURIAE* IN SUPPORT OF DEFENDANTS-APPELLEES** is proportionately spaced, has a typeface of 14 points or more, and contains 4,173 words.

Dated:  February 21, 2014.

*/s/ Scott G. Seidman*

Scott G. Seidman
TONKON TORP LLP
888 SW 5th Avenue, Suite 1600
Portland, OR  97204
(503) 802-2021

1

**EXHIBIT 1**

LIST OF INDIVIDUAL *AMICI*


Timothy K. Armstrong
Associate Dean of Faculty and Professor of Law
University of Cincinnati College of Law

Mark Bartholomew
Professor of Law
SUNY Buffalo Law School

Annemarie Bridy
Alan G. Shepard Professor of Law
University of Idaho College of Law

Dr. Irene Calboli
Professor of Law
Marquette University Law School
Visiting Professor
Faculty of Law
National University of Singapore

Michael A. Carrier
Distinguished Professor
Rutgers Law School

Brian W. Carver
Assistant Professor
University of California, Berkeley
School of Information

Andrew Chin
Associate Professor
University of North Carolina School of Law

Margaret Chon
Donald and Lynda Horowitz
Professor for the Pursuit of Justice
Seattle University College of Law

Ralph D. Clifford
Professor of Law
University of Massachusetts School of Law

Shubha Ghosh (co-author of brief)
Vilas Research Fellow & Elvehjem-Bascom Professor of Law
University of Wisconsin Law School

James Grimmelmann
Professor of Law
University of Maryland
Francis King Carey School of Law

Robert A. Heverly
Associate Professor
Albany Law School of Union University

Dennis S. Karjala
Jack E. Brown Professor of Law
Sandra Day O'Connor College of Law
Arizona State University

Raymond Ku
Professor of Law
Case Western University
School of Law

David Levine
Professor of Law
Elon University School of Law

Stephen McJohn
Professor of Law
Suffolk University Law School

Hiram A. Meléndez Juarbe, JSD
Associate Professor
University of Puerto Rico Law School

Lateef Mtima
Professor of Law
Howard University Law School

Connie Nichols (co-author of brief)
Associate Professor of Law
Baylor University School of Law

Prof. Tyler T. Ochoa
High Tech Law Institute
Santa Clara University School of Law

Aaron Perzanowski
Associate Professor
Case Western Reserve University
School of Law

Jorge Roig
Assistant Professor of Law
Charleston School of Law

Zahr Said
Assistant Professor of Law
University of Wisconsin School of Law

Jason M. Schultz (co-author of brief)
Associate Professor of Clinical Law
Director, Technology Law & Policy Clinic
Co-Director, Engelberg Center on Innovation Law and Policy
NYU School of Law

Dr. David Tan
Associate Professor
Faculty of Law
National University of Singapore

Jennifer M. Urban
Assistant Clinical Professor of Law
Director, Samuelson Law, Technology & Public Policy Clinic
UC-Berkeley School of Law

099997/32308/5310186v1

## CERTIFICATE OF SERVICE

The foregoing **BRIEF OF LAW SCHOLARS AND PROFESSORS AS**

***AMICI CURIAE* IN SUPPORT OF DEFENDANTS-APPELLEES** was

electronically filed with the Clerk of the Court for the U.S. Court of Appeals for

the Ninth Circuit by using the appellate CM/ECF system on February 21, 2014.

All participants in the case are registered CM/ECF users.  Service will be

accomplished by the appellate CM/ECF system.


Dated: February 21, 2014.

                                    */s/ Scott G. Seidman*_____
                                    Scott G. Seidman
                                    TONKON TORP LLP
                                    888 SW 5th Avenue, Suite 1600
                                    Portland, OR  97204
                                    (503) 802-2021

099997/32308/5289387v3

1