Case No. 13-56818

IN THE

# UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

---

FOX BROADCASTING COMPANY, TWENTIETH CENTURY FOX FILM CORP., AND FOX TELEVISION HOLDINGS INC.,

*Plaintiffs-Appellants*,

v.

DISH NETWORK L.L.C., DISH NETWORK CORP., AND ECHOSTAR TECHNOLOGIES L.L.C.,

*Defendants-Appellees*.

---

*On Appeal From The United States District Court For
The Central District Of California
Case No. 12-cv-04529, The Honorable Dolly M. Gee*

---

**BRIEF OF *AMICUS CURIAE* THE CONSUMER FEDERATION OF AMERICA IN SUPPORT OF DEFENDANTS-APPELLEES**

---

GLUSHKO-SAMUELSON INTELLECTUAL PROPERTY LAW CLINIC
Peter Jaszi, *Counsel of Record*
Edward Lang, Alexis Patterson,
Benjamin Penn, Ashley Yull
     *Law Student Attorneys pursuant to Circuit Rule 46-4*
AMERICAN UNIVERSITY WASHINGTON COLLEGE OF LAW
4801 Massachusetts Avenue, N.W.
Washington, DC 20016
(202) 274-4148


     *Attorneys for Amicus Curiae*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

*Amicus Curiae* Consumer Federation of America certifies, pursuant to Rule

26.1 of the Federal Rules of Appellate Procedure, it has no parent corporation and

no publicly held company owns 10 percent or more of its stock.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................iv

STATEMENT OF INTEREST..........................................................viii

SUMMARY OF ARGUMENT..............................................................1

ARGUMENT.........................................................................................3

I.    By Promoting Freedom of Choice in Modes of Access to Information, This Court Can Enable American Consumers' Full Participation in Their Culture.............................................................................................3

    A.    Advances in Technology Increase Cultural Participation and Serve the Purposes of the Copyright Law; Thus, the Copyright Monopoly Should Not Be Utilized to Suppress Technologies Promoting Consumer Sovereignty..........................................................4

    B.    Promoting Consumer Sovereignty Benefits Consumers, Copyright Owners, And Society at Large............................................6

II.   Attacks On Consumer Freedom Undermine the Public Interest Basis Of Copyright And Threaten Doctrines that Protect Consumer Sovereignty........................................................................................12

    A.    Congress And The Courts Have Structured and Interpreted Copyright Law To Protect New Technologies, Giving Consumers Choice In When And How They Access Content..............................................14

    B.    Attacks By Content Owners On Doctrines That Protect The Consumer's Right To Make Use Of Legally Acquired Copyrighted Works Have Eroded Consumers' Ability To Contribute To Culture And Commerce..................................................................16

III.  When Viewed In Light Of The Benefits That Law-Abiding Consumers Derive From DISH Anywhere, Fair Use Arguments Preclude A Finding Of Infringement....................................................................19

A.   By Analogy To *Sony*, Space-Shifting And Time-Shifting Transforms The Work For A Consumer's Private, Personal Use..........................19

B.   Because DISH Place-Shifting Technology Provides Significant Public Benefits To Consumers Who Fairly Use Fox's Works, Any Unauthorized Copying Or Transmitting Done By DISH To Achieve That Use Is Also Fair.......................................................................24

CONCLUSION.....................................................................................................28

# TABLE OF AUTHORITIES

## CASES

*Authors Guild, Inc. v. Google Inc.*, 2013 U.S. Dist. LEXIS 162198 (S.D.N.Y. 2013)…………..…………………………………………….…………….25, 26

*Authors Guild, Inc. v. Hathitrust*, 902 F. Supp. 2d 445 (S.D.N.Y. 2012)…….25, 26

*Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605 (2d Cir. 2006)....21

*Bowers v. Baystate Technologies, Inc.*, 320 F.3d 1317 (Fed. Cir. 2003)……........17

*Campbell v. Acuff-Rose Music*, 510 U.S. 569 (1994)…………....…!..…….....19, 21

*Castle Rock Entm't v. Carol Publ'g Grp.*, 150 F.3d 132 (2d Cir. 1998)….....…21, 26

*eBay Inv. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006)…………....................4

*Gen. Motors Corp. v. Harry Brown's LLC*, 563 F.3d 312 (8th Cir. 2009)…....…..5

*Hustler Magazine Inc. v. Moral Majority, Inc.*, 796 F.2d 1148 (9th Cir. 1986).....22

*Kelly v. Arriba Soft*, 336 F.3d 811 (9th Cir. 2002)……………………...............…24

*Kirtsaeng v. John Wiley & Sons*, 133 S.Ct. 1351 (2013)……………….……17, 18

*MDY Industries v. Blizzard Entertainment*, 629 F.3d 928 (9th Cir. 2010)……......16

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S 913 (2005).....14, 15

*Nintendo of Am., Inc. v. Lewis Galoob Toys, Inc.*, 16 F.3d 1032 (9th Cir. 1994).....4

*Perfect 10 v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007)……………..23, 25

*Sega Enters. v. Accolade, Inc.*, 977 F.2d 1510 (9th Cir. 1992)……...............…..24

*Sofa Entm't, Inc. v. Dodger Prods.*, 709 F.3d 1273 (9th Cir. 2013)…...........…..21

*Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417 (1984)…......passim

*Recording Indus. Ass'n of Am. v. Diamond Multimedia Sys.*, 180 F.3d 1072 (9th Cir. 1999)……………................................……………………………..14

*Time, Inc. v. Bernard Geis Assocs.*, 293 F. Supp. 130 (S.D.N.Y. 1968)….…....…26

*Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151 (1975)……………............5

## STATUTES

17 U.S.C. § 106(4), (5)……………………………………...…………………...13

17 U.S.C. § 107(1)…………………………...………………………….....19

17 U.S.C. § 107(4)…………………...……………………………………….21

17 U.S.C. § 109(a)……………………...…………………………………18

17 U.S.C. § 111…………………………………………...……………..12

17 U.S.C. § 114…………………………………………...……………..12

17 U.S.C. § 119…………………………………...……………………..12

17 U.S.C. § 122…………………………………...……………………..12

## CONSTITUTIONAL PROVISIONS

U.S. Const. art. 1 § 8 cl. 8……………………...………………………...12, 26

## LEGISLATIVE MATERIALS

H.R. Rep. No. 94-1476 (1976)………………………………….......……..13

## OTHER AUTHORITIES

2 Patry on Copyright § 3:7 (2013)………………………….......………………..12

4 Nimmer on Copyright § 13.05[A][4]…………………………......…………..21

Abbey Klaassen, *New Device 'Place-Shifts' TV; Changes Media Assumptions*, Advertising Age (Jun. 5, 2006), http://adage.com/article/digital/device-place-shifts-tv-media-assumptions/109639/……………….............…………………...10

Craig Joyce & L. Ray Patterson, *Copyright in 1791*, 52 Emory L.J. 609 (2003)...12

Derickson, *How People Watch TV*, e-Strategy Trends (May 15, 2013), http://trends.e-strategyblog.com/2013/05/15/how-people-watch-tv/11152…….8

Jeffrey A. Eisenach, *The Economics Of Retransmission Consent*, National Association of Broadcasters (Mar. 2009), http://www.nab.org/documents/resources/050809EconofRetransConsentEmpiris.pdf………………………..............……………………………………………..10

Jim Edwards, *TV Is Dying, and Here Are The Stats That Prove It*, Business Insider (Nov. 24, 2013 10:11 AM), http://www.businessinsider.com/cord-cutters-and-the-death-of-tv-2013-11…………………….............…………………………….7

Joel Waldfogel, *Does Consumer Irrationality Trump Consumer Sovereignty?*, 87 Rev. Econ & Stat 691 (2005)……………………….....…………………………..7

Mark Cooper, *From Wifi to Wikis and Open Source*, 5 J. Telecomm. & High Tech. L. 125 (2006)…………..……….....................……………………………………..6

MarketingCharts, *TV Streamers Say They'd Still Want to Watch TV if They Took a Digital Break*, (Dec. 16, 2013), http://www.marketingcharts.com/wp/online/tv-streamers-say-theyd-still-want-to-watch-tv-if-they-took-a-digital-break-38707/..................................................................................................8

Nielsen, *The Digital Consumer*, 8 (Feb. 2014), http://www.nielsen.com/content/dam/corporate/us/en/reports-downloads/2014%20Reports/the-digital-consumer-report-feb-2104.pdf…........7

Paula Bernstein, *Who Needs TV to Watch TV*, Adweek (Apr. 19, 2012), http://www.adweek.com/sa-article/who-needs-tv-watch-tv-139687………...7, 9

Pew Research Internet Project, *Three Technology Revolutions*, http://www.pewinternet.org/three-technology-revolutions/ (last visited Feb. 21, 2014)………………………………….................................……………………..11

Pierre N. Leval, *Commentary: Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105 (1990)………………….......................…………………………….20

Press Release, CBS Corporation, Magid Media Labs Proves That CBS Online Video Streaming Delivers Younger Audiences To Its Shows (Jul. 21, 2008)… 9

Ronan Deazley, *On The Origin Of The Right To Copy* 226 (2004)……......….11, 12

Testimony of Melinda Witmer, Executive Vice President & Chief Video And Content Officer, Time Warner Cable, The Cable Act At 20, Appendix 1, Committee On Commerce, Science And Transportation, United States Senate (July 24, 2012), http://www.commerce.senate.gov/public/?a=Files.Serve&File_id=1568c4b2-d88c-4b6c-aff5-37a4f5066060……………….........................………………9

Thinkbox, *Broadcaster VOD: An Introduction*, http://www.thinkbox.tv/server/show/nav.2418……………........…………….10

Tim Siglin, *Streams of Thought: MLB's Foul Bawl*, Streaming Media (Aug. 2007), http://www.streamingmedia.com/Articles/Editorial/Featured-Articles/Streams-of-Thought-MLBs-Foul-Bawl-65034.aspx…………………….................……10

Universal Declaration of Human Rights, G.A. Res. 217 (III) A, U.N. Doc. A/RES/217(III), art. 27(1) (Dec. 10, 1948)………………….......………..4

Wayne Friedman, *Broadcast TV Nets Benefit From Time-Shifting*, MediaPost News (Dec 9, 2013, 5:34 PM), http://www.mediapost.com/publications/article/215136/…………..............…..9

William H. Hutt, *The Concept of Consumers' Sovereignty*, 50 The Econ. J. 66 (1940)…………………………………………….............………………..6

## RULES

Fed. R. App. P. 26.1....................................................................................i

Fed. R. App. P. 29(a)...............................................................................viii

Fed. R. App. P. 29(c)(5)...........................................................................v

The Consumer Federation of America respectfully submits this brief as *amicus curiae* with the consent of all parties.[1]   *See* Fed. R. App. P. 29(a).

## STATEMENT OF INTEREST

The Consumer Federation of America (CFA) is a non-profit organization dedicated to serving as a voice for consumers through research, education, and advocacy. As the largest pro-consumer association in the United States, comprised of nearly 300 non-profit member organizations, which themselves have approximately 50 million consumer members nationwide, the CFA is uniquely qualified to speak on issues that impact American consumers. Founded in 1968, the CFA has actively participated in almost every major court case involving the evolution of federal copyright law to account for emerging technologies that enable consumer choice and consumer sovereignty. The CFA submits this brief to inform the Court that a ruling in favor of Fox Broadcasting on the "fair use" issue in the present case would have adverse consequences for the millions of Americans who benefit from time- and space-shifting technology, referred to collectively here as "place-shifting technology": specifically, it would mean a significant diminution in the flexibility and control that they enjoy in consuming lawfully accessed media content.

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(c)(5) counsel for the parties have not authored any part of this brief; no party or a party's counsel contributed money for the brief; and no one other than *Amicus* and its members and counsel have contributed money for this brief.

## SUMMARY OF ARGUMENT

Allowing the use of emerging technologies that enable consumer sovereignty, such as DISH's place-shifting technology, is consistent with the underlying goals of the U.S. copyright system. DISH uses cutting-edge technology to facilitate consumer choice by allowing subscribers to access all of their regular subscription content, including live broadcast television as well as recorded programing, when and where they choose, on a variety of internet-connected platforms. In our increasingly mobile society, the flexibility in accessing content provided by place-shifting technology is particularly important to consumers. The flexibility that this technology provides also increases innovation and competition, with additional ultimate benefits to consumers. The same place-shifting technology that promotes consumer choice also benefits broadcasters and advertisers through increased viewership revenue streams.

The decision below regarding DISH's place-shifting technology was consistent with the holdings of the Supreme Court with respect to copying technology. For the past thirty years, that Court has consistently urged extreme caution in blocking technologies with significant potential for lawful uses by information consumers, including fair uses. To enjoin DISH's place-shifting technology would restrict consumer sovereignty and harken back to the system of

1

print licensing that existed in England prior to the enactment of the first copyright law.

Despite the apparent social and cultural advantages of new technologies that enable consumer choice, copyright holders today seek enhanced control over consumer uses through means such as licensing agreements which strip consumers of important protections codified in our copyright law, and by promoting restrictive interpretations of long-standing copyright doctrines. In affirming the rejection of the injunction sought by Fox, this Court also can affirm the consumer's right to exercise control over the private use of lawfully acquired content.

The fair use doctrine precludes a finding of infringement because law-abiding members of the consuming public derive significant benefits from DISH's technology. Analogous to the VCR technology considered in *Sony*,[2] DISH's place-shifting technology is intended for private, non-commercial use; in addition, it adds transformative value to audiovisual works to which it is applied by allowing them to be viewed in new and significantly different contexts. The benefits of flexibility in making choices about the circumstances of private, personal cultural consumption that the technology provides, outweigh Fox's needs for protection. And because DISH's technology provides these significant public benefits, any incidental unauthorized copying or transmitting done by DISH in promoting those

---

[2] *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417 (1984).

valuable consumer uses also is fair. In particular, the Ninth Circuit Court of Appeals' well-established jurisprudence in the area of copyright and technology, which recognizes that unlicensed fair use copying can facilitate lawful and socially-beneficial activities, should shield DISH from infringement liability.

By enabling consumer choice and consumer sovereignty in the use of lawfully accessed content while still protecting the rights of copyright holders, place-shifting technologies strike the balance between the rights of copyright owners and the rights of users that is inscribed in Sec. 1, Art. I, cl. 8 of the Constitution. *Amicus curiae* the CFA respectfully supports the view that the Court should find that supplying, as well as using, DISH place-shifting technology falls under the protective umbrella of copyright fair use.

## ARGUMENT

### I.    By Promoting Freedom of Choice in Modes of Access to Information, This Court Can Enable American Consumers' Full Participation in Their Culture.

Modern consumers have a strong interest in receiving information in a flexible manner, consistent with the demands that daily life in a fast-paced society places on its members. DISH's place-shifting technology provides the control and choice that enables consumers to participate fully in their culture. In addition, the shared benefit that the technology generates for consumers and content providers represents exactly the kind of balance that American copyright law and policy

3

envisions.

**A. Advances in Technology Increase Cultural Participation and Serve the Purposes of the Copyright Law; Thus, the Copyright Monopoly Should Not Be Utilized to Suppress Technologies Promoting Consumer Sovereignty.**

Choice and control in accessing information are essential to every consumer's ability to participate in this contemporary, media-intensive society. Not only is this principle recognized in domestic law, but the Universal Declaration of Human Rights provides that "[e]veryone has the right freely to participate in the cultural life of the community, to enjoy the arts and to share in scientific advancement and its benefits."[3]

As will be discussed below, the district court was justified in rejecting Fox's preliminary injunction request because the consumer activities described in the complaint were protected, non-infringing "fair uses." In *eBay*, the court stated that it has "…consistently rejected invitations to replace traditional equitable considerations with a rule that an injunction automatically follows a determination that a copyright has been infringed."[4] Thus, public policy does not support the liberal issuance of preliminary injunctions in copyright infringement actions, especially where a significant public interest would be disserved.[5] Enjoining

---

[3] Universal Declaration of Human Rights, G.A. Res. 217 (III) A, U.N. Doc. A/RES/217(III), art. 27(1) (Dec. 10, 1948).
[4] *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 392-93 (2006).
[5] *Nintendo of Am., Inc. v. Lewis Galoob Toys, Inc.*, 16 F.3d 1032, 1038 (9th Cir. 1994).

DISH's place-shifting technology would unnecessarily limit the public's ability to benefit from a technological innovation that can provide meaningful choices about where and how to consume lawfully accessed information.[6] In *Twentieth Century Music Corp. v. Aiken*,[7] the court held that:

> The immediate effect of our copyright law is to secure a fair return for an 'author's' creative labor. But the ultimate aim is, by this incentive, to stimulate creativity for the general public good. "The sole interest of the United States and the primary object in conferring the monopoly," this court has said, "lie in the general benefits derived by the public from the labors of the authors." When technological change has rendered its literal terms ambiguous, the Copyright Act must be construed in the light of this basic purpose.

Just as the Supreme Court in *Aiken* defined 'public performance' with the interests of the ultimate music consumer in mind, the district court here recognized that allowing Fox to control the timing and manner in which broadcast content is enjoyed would adversely affect significant consumer interests.

While choice-promoting forms of consumer information technology evolve over time, their purpose remains constant: with each iteration of new technology, innovators advance citizens' participation in culture and society. Scholars have noted the effect of this long trend, of which the shift to digital is the most recent manifestation, observing that more recently "people are no longer passive

---

[6] *See Gen. Motors Corp. v. Harry Brown's LLC*, 563 F.3d 312, 321 (8th Cir. 2009).
[7] 422 U.S. 151, 156 (1975) (citations omitted).

participants in the economy, as they were in the media available in the past. When offered the opportunity to participate and communicate in the digital information age, people quickly accept."[8]

Like other new information technologies, DISH's place-shifting technology adds to consumer value without upsetting copyrights' balance of competing interests. The institutions of copyright should enable this kind of consumer choice, not interfere with it.

### B.    Promoting Consumer Sovereignty Benefits Consumers, Copyright Owners, And Society At Large.

Today's digital communications revolution emphasizes the concept of consumer sovereignty, or the ability of consumers to access increasing amounts of content where and when they want. DISH's place-shifting technology uses a high-speed internet connection to allow satellite television subscribers to access content that they already pay for from a variety of locations. Subscribers also have the ability to time-shift, choosing when they access content without being constrained by commercial programming schedules. DISH's place-shifting technology provides consumers with a wider variety of choices in the marketplace and leads to a more efficient fit between consumer needs and the available supply of services.[9]

---

[8] Mark Cooper, *From Wifi to Wikis and Open Source*, 5 J. Telecomm. & High Tech. L. 125, 126-127 (2006).
[9] *See generally* William H. Hutt, *The Concept of Consumers' Sovereignty*, 50 The Econ. J. 66 (1940) (describing consumer sovereignty).

This greatly increases the value of that information to consumers by maximizing individual utility and, thus, collective social welfare.[10]

In the decade since high-speed and mobile broadband have become ubiquitous, the viewing of content on mobile devices has increased dramatically.[11] This trend is particularly prevalent among a younger generation of viewers who "no longer see a difference between 'on-TV' viewing and 'online' viewing" and "forgo TV's in favor of watching content on their computers, tablets, or mobile devices."[12] This trend has become so prevalent that the number of households with conventional TV sets has actually declined in recent years.[13]

In accord with this trend, an increasing number of consumers are engaging in time-shifting as their chosen means of accessing content.[14] A study conducted by Netflix found that "roughly 3 in 4 respondents said that streaming TV shows on

---

[10] *See generally* Joel Waldfogel, *Does Consumer Irrationality Trump Consumer Sovereignty?*, 87 Rev. Econ & Stat 691 (2005) (demonstrating the economic benefit of consumer choice in purchasing decisions).

[11] *See* Paula Bernstein, *Who Needs TV to Watch TV*, Adweek (Apr. 19, 2012), http://www.adweek.com/sa-article/who-needs-tv-watch-tv-139687 (indicating that increasingly individuals, particularly Gen Xers, are watching television but not on the television), *see also* Nielsen, *The Digital Consumer*, 8 (Feb. 2014), http://www.nielsen.com/content/dam/corporate/us/en/reports-downloads/2014%20Reports/the-digital-consumer-report-feb-2014.pdf (stating that between 2008 and 2013 computer-based video consumption increased 157 percent).

[12] *See* Bernstein, *supra* note 11 ("According to Nielsen, the 25-to-34 demo spends about 28 hours each week watching traditional TV, compared to 41 hours from those aged 50 to 65 and 32.47 hours for all U.S. viewers.").

[13] *Id.; See also* Jim Edwards, *TV Is Dying, And Here Are The Stats That Prove It*, Business Insider (Nov. 24, 2013 10:11 AM), http://www.businessinsider.com/cord-cutters-and-the-death-of-tv-2013-11 (citing "Nielsen TV Universe" study indicating while the number of households continues to increase in recent years that the number of households with television sets has declined and linking this to increasing viewing from mobile devices).

[14] Bernstein, *supra* note 11.

their own schedule is their preferred way to watch them."[15] A similar study conducted by Harris Interactive found that almost 8 in 10 adult Americans have embraced this form of viewing.[16] In fact, for consumers who access video-on-demand services from their television provider, "[a]n average of just 44% of viewing of full-length TV shows is live."[17] Viewers are also increasingly interested in watching more than one episode of a television series in a sitting, and "up to half of Americans engage in [this type of viewing behavior]."[18] Moreover, a study conducted by Netflix found that of respondents "79% said that watching several episodes of their favorite shows in one session makes the programs more enjoyable."[19]

Viewing flexibility enabled by place-shifting technology increases the value of television content for consumers, but this has a positive impact on the revenues of broadcasters, as well. Allowing viewers to catch up on previous seasons of a current show on alternative platforms is a form of place-shifting that can lead to

---

[15] MarketingCharts, *TV Streamers Say They'd Still Want to Watch TV if They Took a Digital Break*, (Dec. 16, 2013), http://www.marketingcharts.com/wp/online/tv-streamers-say-theyd-still-want-to-watch-tv-if-they-took-a-digital-break-38707/.

[16] *Id.*

[17] Derickson, *How People Watch TV*, e-Strategy Trends (May 15, 2013), http://trends.e-strategyblog.com/2013/05/15/how-people-watch-tv/11152 (citing a study from Vubiquity in which respondents "indicate that 22% of their viewing of full-length TV shows is from a DVR, 14% is on demand, and 6% is via an online source, among others.").

[18] *Id.*

[19] MarketingCharts, *supra* note 16.

"increases in 'live' viewership for later seasons as new viewers get caught up."[20] Acknowledging this phenomenon, CBS found that 35% of its online video audience is more likely to watch CBS programming on television because these viewers connected with shows online.[21]

Since place-shifting lets consumers view programs after they initially air, more consumers are viewing broadcast content.[22] Moreover, the retransmission fees broadcasters receive increased more than tenfold from 2002 to 2012, the very period during which the use of place-shifting and viewing on alternative platforms increased dramatically.[23] Analysis from the National Association of Broadcasters shows that overall revenue for the entities whose programming can be shifted with DISH's place-shifting technology has more than doubled over that same period of

---

[20] Bernstein, *supra* note 11 ("Consider the growth of the audience for AMC's *Breaking Bad*. The fourth season of the show boasted the series' highest rated season to date, a clear example of a show gaining traction over time. Not coincidentally, the biggest gain was among younger viewers, with an increase of 42 percent among adults 18 to 34 compared to the previous season—the audience segment most likely to view the series via non-broadcast channels.").

[21] Press Release, CBS Corporation, Magid Media Labs Proves That CBS Online Video Streaming Delivers Younger Audiences To Its Shows (Jul. 21, 2008) http://www.cbscorporation.com/news-article.php?id=174.

[22] Wayne Friedman, *Broadcast TV Nets Benefit From Time-Shifting*, MediaPost News (Dec 9, 2013, 5:34 PM), http://www.mediapost.com/publications/article/215136/ (documenting the increasing trend towards time-shifting with top shows and how this is increasing viewing of such shows).

[23] Testimony of Melinda Witmer, Executive Vice President & Chief Video And Content Officer, Time Warner Cable, The Cable Act At 20, Appendix 1, Committee On Commerce, Science And Transportation, United States Senate (July 24, 2012), http://www.commerce.senate.gov/public/?a=Files.Serve&File_id=1568c4b2-d88c-4b6c-aff5-37a4f5066060.

time.[24]

Place-shifting technology also benefits advertisers who create ads for a particular target audience, since over time more people will view televised content and be exposed to these campaigns.[25] Furthermore, use of place-shifting technology provides a new opportunity for advertisers to implement "interactive features that would allow viewers to click ads for more information or the opportunity to buy."[26] Indeed, some major suppliers of program content have actively embraced forms of place-shifting; for example, space-shifting has been integrated into the broadcast business model of the National Hockey League (NHL), which signed "an agreement that allows current and future Slingbox customers to share segments of NHL programming online with friends, family, and others, creating a viral marketing opportunity for NHL teams."[27] This agreement is beneficial in that it allows more individuals to see more hockey games, with all of

---

[24] Jeffrey A. Eisenach, *The Economics Of Retransmission Consent*, National Association of Broadcasters (Mar. 2009), http://www.nab.org/documents/resources/050809EconofRetransConsentEmpiris.pdf, at 18.

[25] Thinkbox, *Broadcaster VOD: An Introduction*, http://www.thinkbox.tv/server/show/nav.2418 ("Not only are broadcasters enabling viewers to get the quality, premium TV they want across numerous platforms and on a variety of devices, they are also helping advertisers follow this relationship in all sorts of ways...").

[26] Abbey Klaassen, *New Device 'Place-Shifts' TV; Changes Media Assumptions*, Advertising Age (Jun. 5, 2006), http://adage.com/article/digital/device-place-shifts-tv-media-assumptions/109639/ (indicating that "[t]he potential to interact directly with a broadband connection, broadband applications and commerce opportunities while watching content [created by place-shifting technology] is a very attractive proposition" for advertisers).

[27] Tim Siglin, *Streams of Thought: MLB's Foul Bawl*, Streaming Media (Aug. 2007), http://www.streamingmedia.com/Articles/Editorial/Featured-Articles/Streams-of-Thought-MLBs-Foul-Bawl-65034.aspx (noting that space-shifting, referred to in the article as place-shifting, is beneficial to broadcasters).

the same commercials, and promotes brand loyalty by allowing fans to stay connected with their teams.

Place-shifting also has a supply side impact, increasing the quality of programing and driving innovation. Flexibility in viewing content is a key driver of competition because in the digital age multiple media options compete at any given time for limited consumer attention.[28]  For a consumer with access to DISH's place-shifting technology, recorded programming selected by consumers  becomes a standard against which content from other sources – or even from the same source – must compete. Thus, the technology becomes a powerful pro-competitive force in the marketplace.

## II.     Attacks On Consumer Freedom Undermine The Public Interest Basis Of Copyright And Threaten Doctrines that Protect Consumer Sovereignty.

Consumer interests have been an integral element in the shaping of copyright laws since its earliest days.[29] In 1694, Great Britain ended its system for the licensing of publishers, and in 1710, after a wide-ranging debate, Parliament enacted the Statute of Anne, which "granted the booksellers a measure of support on the supposition that the ultimate benefactor would be the state of learning and

---

[28] Pew Research Internet Project, *Three Technology Revolutions,* http://www.pewinternet.org/three-technology-revolutions/ (last visited Feb. 21, 2014) ("mobile connectivity through cell phones....smartphones, and tablet computers, made any time-anywhere access to information a reality for the vast majority of Americans").

[29] Ronan Deazley, *On The Origin Of The Right To Copy* 226 (2004) (stating that copyright law in 18th century Britain was never simply concerned with the bookseller or author, but was primarily defined and justified in the interests of society).

education within Great Britain."[30] Among other things, the enactment shifted the focus of enforcement away from the control of technology and onto the regulation of commercial behavior. Before the Statute of Anne was enacted, the presses of an unauthorized reprinter could be seized and destroyed; afterwards, publishers were authorized only to seek damages and injunctions against competitors who violated statutory rights that endured only for a limited term.[31] This shift placed the emphasis of the law on prohibiting misuse of breakthrough technologies rather than regulating access to such technologies – an approach consistent with the focus on public interest that has informed copyright from its beginnings.

This public interest conception of copyright is embodied in the intellectual property clause of the Constitution which authorizes the creation of limited monopolies in information because they further the "progress of science …" – that is, the creation and dissemination of culture.[32] Over time, the copyright laws of the United States have been interpreted, and rewritten when necessary, to accommodate innovations in information technology, including (to name a few) photography, sound recordings, and both cable and satellite retransmission.[33] Likewise, Congress has codified copyright's support for many beneficial consumer

---

[30] *Id.* at 165.
[31] Craig Joyce & L. Ray Patterson, *Copyright in 1791*, 52 Emory L.J**.** 909, 920-22 (2003).
[32] U.S. Const. art. 1 §8 cl. 8; *see also* 2 Patry on Copyright § 3:7 (2013) (stating that the term "science" as used in the Constitution refers to the 18th Century concept of learning and knowledge).
[33] 17 U.S.C. §§111, 114, 119, 122 (2010).

uses of legally acquired content through the development of doctrines of non-infringing consumer use such as private performance, fair use, and first sale. These doctrines have been under attack in recent years by content owners who seek not only greater control over how consumers use information, but also over the technology enabling their uses. These efforts have not been uniformly successful, but where the content owners have succeeded they also have eroded the consumerist foundations of copyright itself. The present case presents this Court with an opportunity to stand up for consumer sovereignty and protect these important baseline protections for consumer choice.

### A.    Congress And The Courts Have Structured and Interpreted Copyright Law To Protect New Technologies, Giving Consumers Choice In When And How They Access Content.

When Congress systematically revised the copyright laws in 1976, it did so partly due to "significant changes in technology [that] have affected the operation of the copyright law".[34] The 1976 Act enumerated specific rights belonging exclusively to the copyright holder, including the rights "to perform the copyrighted work *publicly*" and "to display the copyrighted work *publicly*."[35] This qualified language expresses a more general theme of U.S. copyright law: that consumers should have the ability to use and enjoy lawfully acquired copyrighted material in the *private* sphere, without interference by copyright owners.

---

[34] H.R. Rep. No. 94-1476, at 47 (1976).
[35] 17 U.S.C §106(4), (5) (italics added).

In 1984, the adherence of U.S. copyright to this theme was tested in *Sony Corp. of Am. v. Universal City Studios, Inc.*,[36] where the Supreme Court demonstrated a commitment to protecting consumer interests in the context of new information technologies. In *Sony*, a secondary infringement action was brought in an effort by copyright owners to achieve legal control over the design and sale of video cassette recorders that allowed consumers to "time-shift" over-the-air television programming, recording it at one time to watch at their convenience.[37] The Court held that such time-shifting constituted fair use within the meaning of 17 U.S.C. § 107, and that the Betamax technology was permissible because it was "capable of substantial noninfringing uses" including this one.[38] The Court held that such copying technology should not be enjoined when it is "widely used for legitimate unobjectionable purposes".[39]

This key principle was upheld by the Supreme Court in *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,[40] a suit brought against the distributors of peer-to-peer file sharing software. Though the Court ultimately found the distributors liable for actively encouraging (or "inducing") infringement, the Court

---

[36] 464 U.S. 417 (1984).
[37] *Id.* at 423, cf. *Recording Indus. Ass'n of Am. v. Diamond Multimedia Sys.*, 180 F.3d 1072, 1079 (9th Cir. 1999) (stating that place-shifting of music using a portable MP3 player is directly analogous to the time-shifting of broadcast content in *Sony* and is a "paradigmatic non-commercial personal use").
[38] *Sony*, 464 U.S. at 442.
[39] *Id.*
[40] 545 U.S. 913 (2005).

14

was clear that the technology itself should not bear the sins of its distributors' conduct.[41]  In so holding, the Court affirmed that, in general, copyright law should not discourage "the development of technologies with both lawful and unlawful potential."[42] In this case, it has not even been suggested that the consumers who take advantage of the Dish place-shifting technology have any motives other than a legitimate and understandable preference for choice.

**B.    Attacks By Content Owners On Doctrines That Protect The Consumer's Right To Make Use Of Legally Acquired Copyrighted Works Have Eroded Consumers' Ability To Contribute To Culture And Commerce.**

As noted above, the DISH place-shifting technology at issue in this case allows DISH's paying subscribers to make use of their DISH signal when they are not physically proximate to their DISH box. In seeking this injunction, Fox demonstrates that it would prefer that consumers only view their programming in places and manners of which they approve, and that they seek to derive additional revenues from the kinds of consumer flexibilities that DISH place-shifting technology provides. Such efforts to micro-manage consumers' end-uses of lawfully accessed copyrighted materials are reflected, of course, in the lawsuits that led to the original *Sony* decision.  Recently, copyright owners also have

---

[41] *Id.* at 939 (stating in footnote 12 that absent other evidence of intent, a failure to take affirmative steps to discourage infringement cannot give rise to contributory infringement liability, such a holding would threaten the *Sony* safe harbor).
[42] *Id.* at 937.

leveraged end-user licensing agreements (EULA's) in an attempt to impose restraints on new consumer uses and the technologies that enable them.

*MDY Industries v. Blizzard Entertainment* exemplifies this trend.[43] The case involved, *inter alia,* a claim for secondary copyright infringement brought by Blizzard, the developers of the online role-playing game World of Warcraft, against the developers of the program Glider, which automated certain tedious in-game tasks and allowed players to advance more quickly to higher levels.[44] Blizzard asserted that this disadvantaged players who did not use Glider. Though this Court determined that the use of Glider by a consumer with lawful access was not an infringement of Blizzard's copyrights and, therefore, could not serve as the basis for a secondary infringement suit against its developer, it did hold that use of Glider violated the terms of Blizzard's EULA, opening users up to liability for breach of contract.[45] The existence of the EULA in this situation transformed a lawful activity which did not infringe copyright into a cause of action for breach of contract.

In the present case, however, there is no allegation that the subscribers who made use of DISH's place-shifting technology themselves had breached any agreement. More generally, however, consumers' fair use rights are at risk. In

---

[43] 629 F.3d 928 (9th Cir. 2010).
[44] *Id.* at 935-36.
[45] *Id.* at 941.

*Bowers v. Baystate Technologies, Inc.*,[46] the Court of Appeals for the Federal Circuit upheld a finding that a licensee's reverse engineering of computer assisted design (CAD) software, in order to produce his own superior alternative, constituted a contractual breach even though in the absence of such a provision the practice might have been considered as lawful fair use.[47] Judge Dyk, in dissent, preferred a result in which licenses of this kind would be preempted by federal copyright law.[48] In his view, "enforcement of a total ban on reverse engineering would conflict with the Copyright Act itself by protecting otherwise unprotectable material."[49] As Judge Dyk recognized, the enforcement of such license provisions is a real threat to the freedom of information consumers who increasingly cannot rely on the important baselines of protection for users' interests, such as the fair use doctrine, that Congress wrote into the copyright law.

In other contexts, courts have been more solicitous of the freedoms that copyright law has always granted to information consumers. This is reflected by the recent Supreme Court decision in *Kirtsaeng v. John Wiley & Sons*.[50] Here, University of Southern California graduate student Supap Kirtsaeng imported copies of inexpensive editions of popular English-language textbooks that had

---

[46] 320 F.3d 1317 (Fed. Cir. 2003).
[47] *Id.* at 1326; *see Supra* Part III.B (discussing *Sega v. Accolade*)
[48] *Id.* at 1336.
[49] *Id.*
[50] 133 S.Ct. 1351 (2013).

been licensed for the Thai market only, reselling them online for profit.[51] The

Court found in favor of Kirtsaeng, holding that he was not liable for infringing

copyright because the traditional "first sale" doctrine, now codified in §109(a) of

the Copyright Act,[52] applied with the same force to copies lawfully made abroad as

to domestically produced copies.[53] In handing down this ruling, the Court

emphasized the historical importance of the first sale doctrine.[54] *Kirtsaeng*, like

*Sony* and *Grokster,* demonstrates the importance that courts have attached to the

preservation of consumer choice in information use. Likewise, the present case

provides an opportunity for this Court to provide explicit recognition of

consumers' rights to choose how to make private use of the copyrighted material

for which they have paid the market price.

### III.    When Viewed In Light Of The Benefits That Law-Abiding Consumers Derive From DISH's Technology, Fair Use Arguments Should Preclude A Finding Of Infringement.

Under *Sony*, time-shifting, and – by analogy – space-shifting for private use

is lawful fair use.[55] Because DISH's place-shifting technology merely facilitates

this lawful, pro-competitive behavior, it also falls within the protective scope of the

fair use doctrine.

---

[51] *Id.* at 1356.
[52] 17 U.S.C. §109(a) (2010).
[53] *Kirtsaeng*, 133 S.Ct. at 1361.
[54] *Id.* at 1364 (emphasizing the importance of the first sale doctrine to institutions such as museums and libraries).
[55] 464 U.S. 417 (1984).

18

### A.    By Analogy To *Sony*, Space-Shifting And Time-Shifting Transforms The Work For A Consumer's Private, Personal Use.

Since the use of DISH's place-shifting technology by consumers is private, personal, and non-commercial, it should be upheld by the fair use doctrine.[56] Moreover, that use also qualifies as a "transformative" one, within the meaning of the Supreme Court's holding in *Campbell v. Acuff-Rose*.[57]

In *Sony,* the Supreme Court struck a balance between copyright owners' legitimate needs for protection and the rights of others to freely engage in the consumption of culture in concluding that time-shifting was a fair use.[58] Using an "equitable rule of reason" balance, the Court declared that "time shifting expands public access to freely broadcast television programs . . . and yields societal benefits."[59] Applying Section 107 of the Copyright Act, the Court concluded that under the first fair use factor, time-shifting should be favored because it served private, noncommercial purposes.[60] Later, in *Campbell*, a related interpretation of the first factor emerged which places additional emphasis on whether the challenged use had a "transformative" purpose. If "the secondary use adds value to

---

[56] *Id*. at 447-56.
[57] *Campbell v. Acuff-Rose Music*, 510 U.S. 569 (1994).
[58] *Sony*, 464 U.S. at 442.
[59] *Id.* at 426-27 (Affirming that while selling a staple article of commerce, like a typewriter, recorder, camera, or photocopier, technically contributes to any infringing use subsequently made thereof, commerce would be hampered if manufacturers of such articles were held liable as contributory infringers whenever they constructively knew that some purchasers of such products would use them for infringing purposes. This balance is referred to as the "staple article of commerce" doctrine.).
[60] 17 U.S.C. § 107(1).

the original -- if the quoted matter is used as raw material, transformed in the creation of new information, new aesthetics, new insights and understandings -- this is the very type of activity that the fair use doctrine intends to protect for the enrichment of society."[61]

When the Court analyzed the second and third fair use factors, it found that these favored fair use as well, considering "the nature of a televised copyrighted audiovisual work" and also that "time-shifting merely enables a viewer to see such a work which he had been invited to witness in its entirety free of charge, [so] the fact that the entire work [was] reproduced . . . [did] not have its ordinary effect of militating against a finding of fair use."[62]

DISH has a strong case regarding the first three fair use factors. DISH's place-shifting technology creates a substantial public benefit by enabling consumers' choices about how and when they enjoy media content. Like the old-fashioned VCR, DISH technology simply permits the subscriber access to programming he is already entitled to view in a more convenient manner. This is, benign, private, and non-commercial, and – of necessity – requires that the entire work in question be reproduced or the same signal resent. DISH's technology is also "transformative," making DISH's fair use claims for place-shifting even

---

[61] Pierre N. Leval, *Commentary: Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105, 1111 (1990).
[62] *Sony* 464 U.S. at 449.

stronger. The technology makes available television programming which was not previously available for viewing and might have remained so without DISH's secondary use. DISH's place-shifting technology adds value to the original works and "transforms" them within the meaning of that term in fair use doctrine.

*Sony* reminds us, however, that analysis of the first three factors does not end the inquiry. Courts must also consider Section 107(4), "the effect of the use upon the potential market for or value of the copyrighted work."[63]  According to a more recent restatement by the Supreme Court, the fourth factor examines "whether the secondary use usurps the market of the original work,"[64] but "only [in] those [markets] that the creators of the original works would in general develop or license others to develop."[65] Thus, "copyright owners may not preempt exploitation of transformative markets which they would not in general develop or license others to develop by actually developing or licensing others to develop those markets."[66] Otherwise, there would be a "danger of circularity" in which the copyright owner can redefine the "potential market" as he sees fit.[67] Similarly, there must be some limit on Fox's ability to argue that DISH's place-shifting

---

[63] 17 U.S.C. § 107(4).
[64] *Campbell*, 510 U.S. at 593.
[65] *Id*. at 591-92.
[66] *Castle Rock Entm't v. Carol Publ'g Grp.*, 150 F.3d 132, 145 n.11 (2d Cir. 1998). (*See also Sofa Entm't, Inc. v. Dodger Prods.*, 709 F.3d 1273, 1278 (9th Cir. 2013); *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 615 (2d Cir. 2006) (holding that the use of Grateful Dead concert posters to comment on and commemorate the performances they originally were designed to promote was transformative).
[67] 4 Nimmer on Copyright § 13.05[A][4].

21

technology, merely because it enables private choice with no incremental cost to subscribers, cuts into program suppliers' ability to monetize that choice. This Court should take great care to ensure that choices about private information consumption remain with consumers rather than becoming mere market commodities.

In addition, under the fourth factor, since DISH's place-shifting use is noncommercial, Fox bears the burden of showing "by a preponderance of the evidence that some meaningful likelihood of future harm exists."[68] As guidance, the Ninth Circuit in *Hustler Magazine Inc. v. Moral Majority, Inc.* focused on whether the infringing use "tends to diminish or prejudice the potential sale of [the] work, tends to interfere with the marketability of the work, or fulfills the demand for the original work."[69] In the present case, Fox has not shown more than a speculative harm resulting from a possible diminution of its future ability to monetize consumer choice through licensing. This remote possibility is actually rebutted by consumer research. In fact, in the case at hand, DISH technology benefits both consumers *and* copyright owners.[70] The value of information to consumers is increased by its flexibility, and this value increase is shared between consumers and content providers. DISH does not harm, but rather benefits the

---

[68] *Hustler Magazine Inc. v. Moral Majority, Inc.*, 796 F.2d 1148, 1155 (9th Cir. 1986).
[69] *Id.* at 1155-56.
[70] *See Supra* Part II.B.

market value of the works that Fox controls.[71] This fourth factor also weighs

towards a fair use finding.

> **B.     Because DISH's Technology Provides Significant Public Benefits To Consumers Who Fairly Use Fox's Works, Any Unauthorized Copying or Transmitting Done By DISH To Achieve That Use Is Also Fair.**

The immediate challenge in this case is to the activities of Dish in enabling

consumer choice, rather than to the activities of consumers themselves.  But if

consumers' use of the technology constitutes fair use, then Dish should be shielded

from liability as well.  One analytic route to this conclusion might be *Sony*'s

"staple article of commerce doctrine."[72] Another is the principle, developed in the

Ninth Circuit, that recognizes the fair use character of unlicensed copying which,

in turn, facilitates lawful and socially beneficial activities. This Court recognizes

that the "[f]air use doctrine to copyright infringement permits and requires courts

to avoid rigid application of the copyright statute when, on occasion, it would stifle

the very creativity which that law is designed to foster."[73] Here, because what

DISH subscribers do with DISH's technology is a lawful fair use, the means that

DISH employs to enable consumer choice are also fair.

In *Sega Enterprises v. Accolade*, this court held that wholesale, intermediate

copying of protected computer code as an initial step in the development of a non-

---

[71] See *Id.*
[72] *See Supra* Part III.A.; *Sony* 464 U.S. at 426-27.
[73] *Perfect 10 v. Amazon.com, Inc.*, 508 F.3d 1146, 1163 (9th Cir. 2007).

infringing competing product is a fair use where it the only way to gain access to the "functional elements embodied in a copyrighted computer program" which are not themselves protectable by copyright.[74] This Court found that the unauthorized reproduction was fair because it promoted increased creative expression through the wider dissemination of creative works, improved competition within the video game market, and provided significant public and consumer benefits.[75] *Sega* teaches that because the "end" – reverse engineering security software to provide for interoperability – was lawful and pro-competitive, the "means" to that end – decompilation of protected programs – qualified as a fair use.

Building on the logic of *Sega*, *Kelly v. Arriba Soft* and *Perfect 10 v. Amazon* further support the proposition that technologies that involve large-scale copying of protected content can nevertheless qualify as fair uses if they provide otherwise lawful public access to creative expression. *Kelly* found that copying to produce exact replicas of artistic works displayed in thumbnail form by an internet search engine was transformative because it was unrelated to any aesthetic purpose.[76] "Arriba's use of the images serve[d] a different function than [artistic expression] – improving access to information on the internet."[77] In *Perfect 10*, this Court found that Google's copying of internet content to make it searchable was transformative

---

[74] *Sega Enters. v. Accolade, Inc.*, 977 F.2d 1510, 1527 (9th Cir. 1992).
[75] *Id*. at 1523-24, 27.
[76] *Kelly v. Arriba Soft*, 336 F.3d 811, 819 (9th Cir. 2002).
[77] *Id*.

because "a search engine transforms the image into a pointer directing a user to a source of information,"[78] and furthermore, "the significantly transformative nature of Google's search engine, particularly in light of its public benefit, outweigh[ed] Google's superseding and commercial uses of the thumbnails. . . ."[79] Both of these technologies, though they implicated copyright owners' exclusive rights, were considered non-infringing because the end uses to which they were put were legitimate and important ones.

Elsewhere, the recent Southern District of New York court decisions *Authors Guild v. Hathitrust*[80] and *Authors Guild v. Google*[81] reflect the contemporary importance of this "means to an end" logic. These cases involve aspects of the "Google Books" project, which brought about the digitization of tens of millions of library books, many of them protected by copyright.[82] Two judges of the District Court for the Southern District of New York reasoned that because consumers can make a range of pro-cultural end uses of the databases that Google Books brought into being, the reproduction of millions of copyrighted books that brought them into being was fair use.[83] In arriving at their conclusions, Judges

---

[78] *Perfect 10*, 508 F.3d at 1165.
[79] *Id.* at 1166 (noting the important of analyzing fair use flexibly in times of rapid technological change).
[80] *Authors Guild, Inc. v. Hathitrust*, 902 F. Supp. 2d 445 (S.D.N.Y. 2012).
[81] *Authors Guild, Inc. v. Google Inc.*, 2013 U.S. Dist. LEXIS 162198 (S.D.N.Y. 2013).
[82] *Id.* at 4-5.
[83] *Id.* at 13-14 ("Thanks to . . . [Google Books], librarians can identify and efficiently sift through possible research sources, amateur historians have access to a wealth of previously obscure

Harold Baer and Denny Chin took into active account an unenumerated additional factor in fair use analysis: the public interest.[84] Incorporating this consideration, both judges focused on the ultimate goal of copyright itself and asked whether promoting the creation and dissemination of culture would be better served by allowing the use than by preventing it.[85]

DISH's place-shifting technology fosters lawful end use of Fox programming that is both private and noncommercial. It improves public access to information and expressive content,[86] promotes social participation and economic activity,[87] and gives consumers more choices at lower costs without superseding any market in which Fox can claim a legitimate monopoly.[88] In so doing, the technology furthers an important public purpose – consumer choice by individuals who have purchased lawful access to media content. Therefore, even if the

---

material, and everyday readers and researchers can find books that were once buried in research library archives."), *Hathitrust*, 902 F. Supp. 2d at 464 (In addition, "the protection of . . . fragile books, and, perhaps most importantly, the unprecedented ability of print-disabled individuals to have an equal opportunity to compete with their sighted peers . . . protect the copies made by Defendants as fair use . . . .").

[84] *Google Inc.*, 2013 U.S. Dist. LEXIS 162198 at 27-28 ("The various non-exclusive statutory factors are to be weighed together, along with any other relevant considerations, in light of the purposes of the copyright laws. In my view, Google Books provides significant public benefit. It advances the progress of the arts and sciences, while maintaining respectful consideration for the rights of authors and other creative individuals and without adversely impacting the rights of copyright holders."), *Hathitrust*, 902 F. Supp. 2d at 464 ("I cannot imagine a definition of fair use that . . . would require that I terminate this invaluable contribution to the progress of science and the cultivation of the arts."); *see also Time Inc. v. Bernard Geis Assocs.*, 293 F. Supp. 130, 146 (S.D.N.Y. 1968) ("In determining the issue of fair use . . . [t]here is a public interest in having the fullest information available on the murder of President Kennedy.")

[85] U.S. Const. art. 1, § 8, cl. 8; *Castle Rock Entm't*, 150 F.3d at 141.

[86] *See Supra* Part III.A.

[87] *See Id.* Part. I.A.

[88] *See Id.* Part I.B. and III.A.

technology, to some extent, impinges on Fox's exclusive rights, a full accounting of the benefits it yields should help serve to shield DISH from liability. It is just the type of fair use that this Copyright Act and that this Court encourages.

## CONCLUSION

Technologies like those offered by DISH serve a fundamental public interest, promoting consumers' access to lawfully acquired content and their freedom of choice in how to use it. By enabling consumer sovereignty, this technology also benefits content producers by helping them to reach many additional viewers. Such technology is ultimately consistent with the intent of the U.S. Constitution, the Copyright Act and this Court's fair use jurisprudence. By upholding the district court's denial of a preliminary injunction this Court can recognize the important role place-shifting technologies have assumed in American life, and in so doing preserve a legal space for future technologies that seek to meet the information and entertainment needs of Americans.


DATED: February 21, 2014           GLUSHKO-SAMUELSON
                                   INTELLECTUAL PROPERTY LAW
                                   CLINIC

                                   By: /s/ Peter A. Jaszi
                                        Peter A. Jaszi
                                   *Attorneys for Amicus Curiae*
                                   *Consumer Federation of America*

**Form 6.**     **Certificate of Compliance With Type-Volume Limitation, Typeface Requirements, and Type Style Requirements**

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

   ☒ this brief contains <u>6916</u> words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

   ☐ this brief uses a monospaced typeface and contains_____ lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   ☒ this brief has been prepared in a proportionally spaced typeface using *(state name and version of word processing program)* <u>Microsoft Word for Mac 2011</u> *(state font size and name of type style)* <u>14, Times New Roman</u>, *or*

   ☐ this brief has been prepared in a monospaced spaced typeface using *(state name and version of word processing program)* _____ with *(state number of characters per inch and name of type style)* _____.

Signature  | s/Peter Jaszi |

Attorney for | Amicus Curiae, Consumer Federation of America |

Date | 2/21/2014 |

9th Circuit Case Number(s) | 13-56818

**NOTE:** To secure your input, you should print the filled-in form to PDF (File > Print > *PDF Printer/Creator*).

*************************************************************************

## CERTIFICATE OF SERVICE
### When All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) | 2/21/2014 |.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Signature (use "s/" format) | s/Peter Jaszi

*************************************************************************

## CERTIFICATE OF SERVICE
### When <u>Not</u> All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) | |.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within 3 calendar days to the following non-CM/ECF participants:

Signature (use "s/" format) |