JENNER&BLOCK

June 25, 2014

Jenner & Block LLP
633 West 5th Street
Suite 3600
Los Angeles, CA 90071
Tel 213-239-5100
www.jenner.com

Chicago
Los Angeles
New York
Washington, DC

Richard L. Stone
Tel 213 239-2203
Fax 213 239-2213
rstone@jenner.com

Molly C. Dwyer
Clerk of the Court
United States Court of Appeals
  For the Ninth Circuit
P.O. Box 193939
San Francisco, CA  94119-3939

> **Re:** ***Fox Broadcasting Company, et al. v. DISH Network, L.L.C., et al***
> **C.D. Cal. Case No. 13-56818**
>
> **Date of Argument: July 7, 2014**

Dear Ms. Dwyer:

Pursuant to FRAP 28(j), appellants Fox Broadcasting Company, Twentieth Century Fox Film Corp., and Fox Television Holdings, Inc. (together, "Fox") respectfully submit a copy of the Supreme Court's much-anticipated decision in *American Broadcasting Cos., et al. v. Aereo, Inc.* ("*Aereo*"), --- S.Ct. ----, 2014 WL 2864485, Case No. 13-461 (June 25, 2014) (Exhibit A). As reflected in Fox's opening and reply briefs, the *Aereo* case is directly relevant to this appeal because it addresses the legality of unauthorized Internet streaming of broadcast television programming.

In *Aereo*, the Supreme Court held that Aereo's unauthorized retransmission of Fox's television programming over the Internet constitutes an unauthorized public performance of Fox's copyrighted works.  Dish, which engages in virtually identical conduct when it streams Fox's programming to Dish subscribers over the Internet – albeit also in violation of an express contractual prohibition – has repeatedly raised the same defenses as Aereo which have now been rejected by the Supreme Court.  Among other things, the Supreme Court rejected Aereo's argument (proffered by Dish here, RB 16, 51) that it is merely an equipment provider and that Aereo's *subscribers* were the ones transmitting content over the Internet to themselves.  Slip Op. at 4, 9.

The Supreme Court also rejected Aereo's argument (proffered by Dish here, RB 47) that *subscribers* were solely responsible for transmitting Fox's programming because subscribers must press a button on Aereo's website to activate the streaming service.  Slip Op. at 10.

June 25, 2014
Page 2

Additionally, the Supreme Court rejected Aereo's argument (proffered by Dish here, RB 52) that a performance is not "public" under the Copyright Act if each subscriber watches a unique, one-to-one stream of the program. Instead, the Court adopted Fox's argument that the Copyright Act's definition of public performance broadly encompasses *any* device or process that transmits Fox's programming to the public, even if each person receives it at different times or different places. Slip Op. at 13.

The Supreme Court remanded the *Aereo* case to the Southern District of New York, which previously ruled that Aereo's unauthorized Internet streaming of Fox's broadcast television programming irreparably harms Fox. 874 F.Supp.2d 373, 397 (S.D.N.Y. 2012).

Respectfully submitted,

Richard L. Stone
Partner

cc: All Counsel of Record (via ECF)

Enclosure

# EXHIBIT A

(Slip Opinion)     OCTOBER TERM, 2013     1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## AMERICAN BROADCASTING COS., INC., ET AL. *v.* AEREO, INC., FKA BAMBOOM LABS, INC.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

No. 13–461.   Argued April 22, 2014—Decided June 25, 2014

The Copyright Act of 1976 gives a copyright owner the "exclusive righ[t]" to "perform the copyrighted work publicly." 17 U. S. C. §106(4). The Act's Transmit Clause defines that exclusive right to include the right to "transmit or otherwise communicate a performance . . . of the [copyrighted] work . . . to the public, by means of any device or process, whether the members of the public capable of receiving the performance . . . receive it in the same place or in separate places and at the same time or at different times." §101.

Respondent Aereo, Inc., sells a service that allows its subscribers to watch television programs over the Internet at about the same time as the programs are broadcast over the air. When a subscriber wants to watch a show that is currently airing, he selects the show from a menu on Aereo's website. Aereo's system, which consists of thousands of small antennas and other equipment housed in a centralized warehouse, responds roughly as follows: A server tunes an antenna, which is dedicated to the use of one subscriber alone, to the broadcast carrying the selected show. A transcoder translates the signals received by the antenna into data that can be transmitted over the Internet. A server saves the data in a subscriber-specific folder on Aereo's hard drive and begins streaming the show to the subscriber's screen once several seconds of programming have been saved. The streaming continues, a few seconds behind the over-the-air broadcast, until the subscriber has received the entire show.

Petitioners, who are television producers, marketers, distributors, and broadcasters that own the copyrights in many of the programs that Aereo streams, sued Aereo for copyright infringement. They sought a preliminary injunction, arguing that Aereo was infringing

Syllabus

their right to "perform" their copyrighted works "publicly." The District Court denied the preliminary injunction, and the Second Circuit affirmed.

*Held*: Aereo performs petitioners' works publicly within the meaning of the Transmit Clause. Pp. 4–18.

(a) Aereo "perform[s]." It does not merely supply equipment that allows others to do so. Pp. 4–10.

(1) One of Congress' primary purposes in amending the Copyright Act in 1976 was to overturn this Court's holdings that the activities of community antenna television (CATV) providers fell outside the Act's scope. In *Fortnightly Corp.* v. *United Artists Television, Inc.*, 392 U. S. 390, the Court determined that a CATV provider was more like a viewer than a broadcaster, because its system "no more than enhances the viewer's capacity to receive the broadcaster's signals [by] provid[ing] a well-located antenna with an efficient connection to the viewer's television set." *Id.*, at 399. Therefore, the Court concluded, a CATV provider did not perform publicly. The Court reached the same determination in respect to a CATV provider that retransmitted signals from hundreds of miles away in *Teleprompter Corp.* v. *Columbia Broadcasting System, Inc.*, 415 U. S. 394. "The reception and rechanneling of [broadcast television signals] for simultaneous viewing is essentially a viewer function, irrespective of the distance between the broadcasting station and the ultimate viewer," the Court said. *Id.*, at 408. Pp. 4–7.

(2) In 1976, Congress amended the Copyright Act in large part to reject the *Fortnightly* and *Teleprompter* holdings. The Act now clarifies that to "perform" an audiovisual work means "to show its images in any sequence or to make the sounds accompanying it audible." §101. Thus, *both* the broadcaster *and* the viewer "perform," because they both show a television program's images and make audible the program's sounds. Congress also enacted the Transmit Clause, which specifies that an entity performs when it "transmit[s] . . . a performance . . . to the public." *Ibid.* The Clause makes clear that an entity that acts like a CATV system itself performs, even when it simply enhances viewers' ability to receive broadcast television signals. Congress further created a complex licensing scheme that sets out the conditions, including the payment of compulsory fees, under which cable systems may retransmit broadcasts to the public. §111. Congress made all three of these changes to bring cable system activities within the Copyright Act's scope. Pp. 7–8.

(3) Because Aereo's activities are substantially similar to those of the CATV companies that Congress amended the Act to reach, Aereo is not simply an equipment provider. Aereo sells a service that allows subscribers to watch television programs, many of which are

Syllabus

copyrighted, virtually as they are being broadcast. Aereo uses its own equipment, housed in a centralized warehouse, outside of its users' homes. By means of its technology, Aereo's system "receive[s] programs that have been released to the public and carr[ies] them by private channels to additional viewers." *Fortnightly, supra,* at 400.

This Court recognizes one particular difference between Aereo's system and the cable systems at issue in *Fortnightly* and *Teleprompter*: The systems in those cases transmitted constantly, whereas Aereo's system remains inert until a subscriber indicates that she wants to watch a program. In other cases involving different kinds of service or technology providers, a user's involvement in the operation of the provider's equipment and selection of the content transmitted may well bear on whether the provider performs within the meaning of the Act. But given Aereo's overwhelming likeness to the cable companies targeted by the 1976 amendments, this sole technological difference between Aereo and traditional cable companies does not make a critical difference here. Pp. 8–10.

(b) Aereo also performs petitioners' works "publicly." Under the Clause, an entity performs a work publicly when it "transmit[s] . . . a performance . . . of the work . . . to the public." §101. What performance, if any, does Aereo transmit? Petitioners say Aereo transmits a *prior* performance of their works, whereas Aereo says the performance it transmits is the *new* performance created by its act of transmitting. This Court assumes *arguendo* that Aereo is correct and thus assumes, for present purposes, that to transmit a performance of an audiovisual work means to communicate contemporaneously visible images and contemporaneously audible sounds of the work. Under the Court's assumed definition, Aereo transmits a performance whenever its subscribers watch a program.

What about the Clause's further requirement that Aereo transmit a performance "to the public"? Aereo claims that because it transmits from user-specific copies, using individually-assigned antennas, and because each transmission is available to only one subscriber, it does not transmit a performance "to the public." Viewed in terms of Congress' regulatory objectives, these behind-the-scenes technological differences do not distinguish Aereo's system from cable systems, which do perform publicly. Congress would as much have intended to protect a copyright holder from the unlicensed activities of Aereo as from those of cable companies.

The text of the Clause effectuates Congress' intent. Under the Clause, an entity may transmit a performance through multiple transmissions, where the performance is of the same work. Thus when an entity communicates the same contemporaneously perceptible images and sounds to multiple people, it "transmit[s] . . . a per-

4          AMERICAN BROADCASTING COS. *v.* AEREO, INC.

Syllabus

formance" to them, irrespective of the number of discrete communications it makes and irrespective of whether it transmits using a single copy of the work or, as Aereo does, using an individual personal copy for each viewer.

Moreover, the subscribers to whom Aereo transmits constitute "the public" under the Act. This is because Aereo communicates the same contemporaneously perceptible images and sounds to a large number of people who are unrelated and unknown to each other. In addition, neither the record nor Aereo suggests that Aereo's subscribers receive performances in their capacities as owners or possessors of the underlying works. This is relevant because when an entity performs to a set of people, whether they constitute "the public" often depends upon their relationship to the underlying work. Finally, the statute makes clear that the fact that Aereo's subscribers may receive the same programs at different times and locations is of no consequence. Aereo transmits a performance of petitioners' works "to the public." Pp. 11–15.

(c) Given the limited nature of this holding, the Court does not believe its decision will discourage the emergence or use of different kinds of technologies. Pp. 15–17.

712 F. 3d 676, reversed and remanded.

BREYER, J., delivered the opinion of the Court, in which ROBERTS, C. J., and KENNEDY, GINSBURG, SOTOMAYOR, and KAGAN, JJ., joined. SCALIA, J., filed a dissenting opinion, in which THOMAS and ALITO, JJ., joined.

Cite as: 573 U. S. ____ (2014)    1

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 13–461

_____

AMERICAN BROADCASTING COMPANIES, INC., ET AL., PETITIONERS *v.* AEREO, INC., FKA BAMBOOM LABS, INC.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[June 25, 2014]

JUSTICE BREYER delivered the opinion of the Court.

The Copyright Act of 1976 gives a copyright owner the "exclusive righ[t]" to "perform the copyrighted work publicly." 17 U. S. C. §106(4). The Act's Transmit Clause defines that exclusive right as including the right to

> "transmit or otherwise communicate a performance . . . of the [copyrighted] work . . . to the public, by means of any device or process, whether the members of the public capable of receiving the performance . . . receive it in the same place or in separate places and at the same time or at different times." §101.

We must decide whether respondent Aereo, Inc., infringes this exclusive right by selling its subscribers a technologically complex service that allows them to watch television programs over the Internet at about the same time as the programs are broadcast over the air. We conclude that it does.

Opinion of the Court

# I
## A

For a monthly fee, Aereo offers subscribers broadcast television programming over the Internet, virtually as the programming is being broadcast. Much of this programming is made up of copyrighted works. Aereo neither owns the copyright in those works nor holds a license from the copyright owners to perform those works publicly.

Aereo's system is made up of servers, transcoders, and thousands of dime-sized antennas housed in a central warehouse. It works roughly as follows: First, when a subscriber wants to watch a show that is currently being broadcast, he visits Aereo's website and selects, from a list of the local programming, the show he wishes to see.

Second, one of Aereo's servers selects an antenna, which it dedicates to the use of that subscriber (and that subscriber alone) for the duration of the selected show. A server then tunes the antenna to the over-the-air broadcast carrying the show. The antenna begins to receive the broadcast, and an Aereo transcoder translates the signals received into data that can be transmitted over the Internet.

Third, rather than directly send the data to the subscriber, a server saves the data in a subscriber-specific folder on Aereo's hard drive. In other words, Aereo's system creates a subscriber-specific copy—that is, a "personal" copy—of the subscriber's program of choice.

Fourth, once several seconds of programming have been saved, Aereo's server begins to stream the saved copy of the show to the subscriber over the Internet. (The subscriber may instead direct Aereo to stream the program at a later time, but that aspect of Aereo's service is not before us.) The subscriber can watch the streamed program on the screen of his personal computer, tablet, smart phone, Internet-connected television, or other Internet-connected device. The streaming continues, a mere few seconds

Opinion of the Court

behind the over-the-air broadcast, until the subscriber has received the entire show. See A Dictionary of Computing 494 (6th ed. 2008) (defining "streaming" as "[t]he process of providing a steady flow of audio or video data so that an Internet user is able to access it as it is transmitted").

Aereo emphasizes that the data that its system streams to each subscriber are the data from his own personal copy, made from the broadcast signals received by the particular antenna allotted to him. Its system does not transmit data saved in one subscriber's folder to any other subscriber. When two subscribers wish to watch the same program, Aereo's system activates two separate antennas and saves two separate copies of the program in two separate folders. It then streams the show to the subscribers through two separate transmissions—each from the subscriber's personal copy.

B

Petitioners are television producers, marketers, distributors, and broadcasters who own the copyrights in many of the programs that Aereo's system streams to its subscribers. They brought suit against Aereo for copyright infringement in Federal District Court. They sought a preliminary injunction, arguing that Aereo was infringing their right to "perform" their works "publicly," as the Transmit Clause defines those terms.

The District Court denied the preliminary injunction. 874 F. Supp. 2d 373 (SDNY 2012). Relying on prior Circuit precedent, a divided panel of the Second Circuit affirmed. *WNET, Thirteen* v. *Aereo, Inc.*, 712 F. 3d 676 (2013) (citing *Cartoon Network LP, LLLP* v. *CSC Holdings, Inc.*, 536 F. 3d 121 (2008)). In the Second Circuit's view, Aereo does not perform publicly within the meaning of the Transmit Clause because it does not transmit "to the public." Rather, each time Aereo streams a program to a subscriber, it sends a *private* transmission that is avail-

4      AMERICAN BROADCASTING COS. *v.* AEREO, INC.

able only to that subscriber.  The Second Circuit denied rehearing en banc, over the dissent of two judges.  *WNET, Thirteen* v. *Aereo, Inc.*, 722 F. 3d 500 (2013).  We granted certiorari.

## II

This case requires us to answer two questions: First, in operating in the manner described above, does Aereo "perform" at all?  And second, if so, does Aereo do so "publicly"?  We address these distinct questions in turn.

Does Aereo "perform"?  See §106(4) ("[T]he owner of [a] copyright . . . has the exclusive righ[t] . . . to *perform* the copyrighted work publicly" (emphasis added)); §101 ("To *perform* . . . a work 'publicly' means [among other things] to transmit . . . a performance . . . of the work . . . to the public . . . " (emphasis added)).  Phrased another way, does Aereo "transmit . . . a performance" when a subscriber watches a show using Aereo's system, or is it only the subscriber who transmits?  In Aereo's view, it does not perform.  It does no more than supply equipment that "emulate[s] the operation of a home antenna and [digital video recorder (DVR)]."  Brief for Respondent 41.  Like a home antenna and DVR, Aereo's equipment simply responds to its subscribers' directives.  So it is only the subscribers who "perform" when they use Aereo's equipment to stream television programs to themselves.

Considered alone, the language of the Act does not clearly indicate when an entity "perform[s]" (or "transmit[s]") and when it merely supplies equipment that allows others to do so.  But when read in light of its purpose, the Act is unmistakable: An entity that engages in activities like Aereo's performs.

## A

History makes plain that one of Congress' primary purposes in amending the Copyright Act in 1976 was to

Opinion of the Court

overturn this Court's determination that community antenna television (CATV) systems (the precursors of modern cable systems) fell outside the Act's scope. In *Fortnightly Corp.* v. *United Artists Television, Inc.*, 392 U. S. 390 (1968), the Court considered a CATV system that carried local television broadcasting, much of which was copyrighted, to its subscribers in two cities. The CATV provider placed antennas on hills above the cities and used coaxial cables to carry the signals received by the antennas to the home television sets of its subscribers. The system amplified and modulated the signals in order to improve their strength and efficiently transmit them to subscribers. A subscriber "could choose any of the . . . programs he wished to view by simply turning the knob on his own television set." *Id.,* at 392. The CATV provider "neither edited the programs received nor originated any programs of its own." *Ibid.*

Asked to decide whether the CATV provider infringed copyright holders' exclusive right to perform their works publicly, the Court held that the provider did not "perform" at all. See 17 U. S. C. §1(c) (1964 ed.) (granting copyright holder the exclusive right to "perform . . . in public for profit" a nondramatic literary work), §1(d) (granting copyright holder the exclusive right to "perform . . . publicly" a dramatic work). The Court drew a line: "Broadcasters perform. Viewers do not perform." 392 U. S., at 398 (footnote omitted). And a CATV provider "falls on the viewer's side of the line." *Id.,* at 399.

The Court reasoned that CATV providers were unlike broadcasters:

> "Broadcasters select the programs to be viewed; CATV systems simply carry, without editing, whatever programs they receive. Broadcasters procure programs and propagate them to the public; CATV systems receive programs that have been released to the public

and carry them by private channels to additional viewers." *Id.,* at 400.

Instead, CATV providers were more like viewers, for "the basic function [their] equipment serves is little different from that served by the equipment generally furnished by" viewers. *Id.,* at 399. "Essentially," the Court said, "a CATV system no more than enhances the viewer's capacity to receive the broadcaster's signals [by] provid[ing] a well-located antenna with an efficient connection to the viewer's television set." *Ibid.* Viewers do not become performers by using "amplifying equipment," and a CATV provider should not be treated differently for providing viewers the same equipment. *Id.,* at 398–400.

In *Teleprompter Corp.* v. *Columbia Broadcasting System, Inc.,* 415 U. S. 394 (1974), the Court considered the copyright liability of a CATV provider that carried broadcast television programming into subscribers' homes from hundreds of miles away. Although the Court recognized that a viewer might not be able to afford amplifying equipment that would provide access to those distant signals, it nonetheless found that the CATV provider was more like a viewer than a broadcaster. *Id.,* at 408–409. It explained: "The reception and rechanneling of [broadcast television signals] for simultaneous viewing is essentially a viewer function, irrespective of the distance between the broadcasting station and the ultimate viewer." *Id.,* at 408.

The Court also recognized that the CATV system exercised some measure of choice over what to transmit. But that fact did not transform the CATV system into a broadcaster. A broadcaster exercises significant creativity in choosing what to air, the Court reasoned. *Id.,* at 410. In contrast, the CATV provider makes an initial choice about which broadcast stations to retransmit, but then "'simply carr[ies], without editing, whatever programs [it] receive[s].'" *Ibid.* (quoting *Fortnightly, supra,* at 400 (altera-

Opinion of the Court

tions in original)).

### B

In 1976 Congress amended the Copyright Act in large part to reject the Court's holdings in *Fortnightly* and *Teleprompter*. See H. R. Rep. No. 94–1476, pp. 86–87 (1976) (hereinafter H. R. Rep.) (The 1976 amendments "completely overturned" this Court's narrow construction of the Act in *Fortnightly* and *Teleprompter*). Congress enacted new language that erased the Court's line between broadcaster and viewer, in respect to "perform[ing]" a work. The amended statute clarifies that to "perform" an audiovisual work means "to show its images in any sequence or to make the sounds accompanying it audible." §101; see *ibid.* (defining "[a]udiovisual works" as "works that consist of a series of related images which are intrinsically intended to be shown by the use of machines . . . , together with accompanying sounds"). Under this new language, *both* the broadcaster *and* the viewer of a television program "perform," because they both show the program's images and make audible the program's sounds. See H. R. Rep., at 63 ("[A] broadcasting network is performing when it transmits [a singer's performance of a song] . . . and any individual is performing whenever he or she . . . communicates the performance by turning on a receiving set").

Congress also enacted the Transmit Clause, which specifies that an entity performs publicly when it "transmit[s] . . . a performance . . . to the public." §101; see *ibid.* (defining "[t]o 'transmit' a performance" as "to communicate it by any device or process whereby images or sounds are received beyond the place from which they are sent"). Cable system activities, like those of the CATV systems in *Fortnightly* and *Teleprompter*, lie at the heart of the activities that Congress intended this language to cover. See H. R. Rep., at 63 ("[A] cable television system is perform-

Opinion of the Court

ing when it retransmits [a network] broadcast to its subscribers"); see also *ibid.* ("[T]he concep[t] of public performance . . . cover[s] not only the initial rendition or showing, but also any further act by which that rendition or showing is transmitted or communicated to the public"). The Clause thus makes clear that an entity that acts like a CATV system itself performs, even if when doing so, it simply enhances viewers' ability to receive broadcast television signals.

Congress further created a new section of the Act to regulate cable companies' public performances of copyrighted works. See §111. Section 111 creates a complex, highly detailed compulsory licensing scheme that sets out the conditions, including the payment of compulsory fees, under which cable systems may retransmit broadcasts. H. R. Rep., at 88 (Section 111 is primarily "directed at the operation of cable television systems and the terms and conditions of their liability for the retransmission of copyrighted works").

Congress made these three changes to achieve a similar end: to bring the activities of cable systems within the scope of the Copyright Act.

## C

This history makes clear that Aereo is not simply an equipment provider. Rather, Aereo, and not just its subscribers, "perform[s]" (or "transmit[s]"). Aereo's activities are substantially similar to those of the CATV companies that Congress amended the Act to reach. See *id.,* at 89 ("[C]able systems are commercial enterprises whose basic retransmission operations are based on the carriage of copyrighted program material"). Aereo sells a service that allows subscribers to watch television programs, many of which are copyrighted, almost as they are being broadcast. In providing this service, Aereo uses its own equipment, housed in a centralized warehouse, outside of its users'

Opinion of the Court

homes. By means of its technology (antennas, transcoders, and servers), Aereo's system "receive[s] programs that have been released to the public and carr[ies] them by private channels to additional viewers." *Fortnightly*, 392 U. S., at 400. It "carr[ies] . . . whatever programs [it] receive[s]," and it offers "all the programming" of each over-the-air station it carries. *Id.,* at 392, 400.

Aereo's equipment may serve a "viewer function"; it may enhance the viewer's ability to receive a broadcaster's programs. It may even emulate equipment a viewer could use at home. But the same was true of the equipment that was before the Court, and ultimately before Congress, in *Fortnightly* and *Teleprompter*.

We recognize, and Aereo and the dissent emphasize, one particular difference between Aereo's system and the cable systems at issue in *Fortnightly* and *Teleprompter*. The systems in those cases transmitted constantly; they sent continuous programming to each subscriber's television set. In contrast, Aereo's system remains inert until a subscriber indicates that she wants to watch a program. Only at that moment, in automatic response to the subscriber's request, does Aereo's system activate an antenna and begin to transmit the requested program.

This is a critical difference, says the dissent. It means that Aereo's subscribers, not Aereo, "selec[t] the copyrighted content" that is "perform[ed]," *post,* at 4 (opinion of SCALIA, J.), and for that reason they, not Aereo, "transmit" the performance. Aereo is thus like "a copy shop that provides its patrons with a library card." *Post,* at 5. A copy shop is not directly liable whenever a patron uses the shop's machines to "reproduce" copyrighted materials found in that library. See §106(1) ("exclusive righ[t] . . . to reproduce the copyrighted work"). And by the same token, Aereo should not be directly liable whenever its patrons use its equipment to "transmit" copyrighted television programs to their screens.

Opinion of the Court

In our view, however, the dissent's copy shop argument, in whatever form, makes too much out of too little. Given Aereo's overwhelming likeness to the cable companies targeted by the 1976 amendments, this sole technological difference between Aereo and traditional cable companies does not make a critical difference here. The subscribers of the *Fortnightly* and *Teleprompter* cable systems also selected what programs to display on their receiving sets. Indeed, as we explained in *Fortnightly*, such a subscriber "could choose any of the . . . programs he wished to view by simply turning the knob on his own television set." 392 U. S., at 392. The same is true of an Aereo subscriber. Of course, in *Fortnightly* the television signals, in a sense, lurked behind the screen, ready to emerge when the subscriber turned the knob. Here the signals pursue their ordinary course of travel through the universe until today's "turn of the knob"—a click on a website—activates machinery that intercepts and reroutes them to Aereo's subscribers over the Internet. But this difference means nothing to the subscriber. It means nothing to the broadcaster. We do not see how this single difference, invisible to subscriber and broadcaster alike, could transform a system that is for all practical purposes a traditional cable system into "a copy shop that provides its patrons with a library card."

In other cases involving different kinds of service or technology providers, a user's involvement in the operation of the provider's equipment and selection of the content transmitted may well bear on whether the provider performs within the meaning of the Act. But the many similarities between Aereo and cable companies, considered in light of Congress' basic purposes in amending the Copyright Act, convince us that this difference is not critical here. We conclude that Aereo is not just an equipment supplier and that Aereo "perform[s]."

Opinion of the Court

## III

Next, we must consider whether Aereo performs petitioners' works "publicly," within the meaning of the Transmit Clause. Under the Clause, an entity performs a work publicly when it "transmit[s] . . . a performance . . . of the work . . . to the public." §101. Aereo denies that it satisfies this definition. It reasons as follows: First, the "performance" it "transmit[s]" is the performance created by its act of transmitting. And second, because each of these performances is capable of being received by one and only one subscriber, Aereo transmits privately, not publicly. Even assuming Aereo's first argument is correct, its second does not follow.

We begin with Aereo's first argument. What performance does Aereo transmit? Under the Act, "[t]o 'transmit' a performance . . . is to communicate it by any device or process whereby images or sounds are received beyond the place from which they are sent." *Ibid.* And "[t]o 'perform'" an audiovisual work means "to show its images in any sequence or to make the sounds accompanying it audible." *Ibid.*

Petitioners say Aereo transmits a *prior* performance of their works. Thus when Aereo retransmits a network's prior broadcast, the underlying broadcast (itself a performance) is the performance that Aereo transmits. Aereo, as discussed above, says the performance it transmits is the *new* performance created by its act of transmitting. That performance comes into existence when Aereo streams the sounds and images of a broadcast program to a subscriber's screen.

We assume *arguendo* that Aereo's first argument is correct. Thus, for present purposes, to transmit a performance of (at least) an audiovisual work means to communicate contemporaneously visible images and contemporaneously audible sounds of the work. Cf. *United States* v. *American Soc. of Composers, Authors and Publishers,*

Opinion of the Court

627 F. 3d 64, 73 (CA2 2010) (holding that a download of a work is not a performance because the data transmitted are not "contemporaneously perceptible"). When an Aereo subscriber selects a program to watch, Aereo streams the program over the Internet to that subscriber. Aereo thereby "communicate[s]" to the subscriber, by means of a "device or process," the work's images and sounds. §101. And those images and sounds are contemporaneously visible and audible on the subscriber's computer (or other Internet-connected device). So under our assumed definition, Aereo transmits a performance whenever its subscribers watch a program.

But what about the Clause's further requirement that Aereo transmit a performance "to the public"? As we have said, an Aereo subscriber receives broadcast television signals with an antenna dedicated to him alone. Aereo's system makes from those signals a personal copy of the selected program. It streams the content of the copy to the same subscriber and to no one else. One and only one subscriber has the ability to see and hear each Aereo transmission. The fact that each transmission is to only one subscriber, in Aereo's view, means that it does not transmit a performance "to the public."

In terms of the Act's purposes, these differences do not distinguish Aereo's system from cable systems, which do perform "publicly." Viewed in terms of Congress' regulatory objectives, why should any of these technological differences matter? They concern the behind-the-scenes way in which Aereo delivers television programming to its viewers' screens. They do not render Aereo's commercial objective any different from that of cable companies. Nor do they significantly alter the viewing experience of Aereo's subscribers. Why would a subscriber who wishes to watch a television show care much whether images and sounds are delivered to his screen via a large multisubscriber antenna or one small dedicated antenna, whether they

Opinion of the Court

arrive instantaneously or after a few seconds' delay, or whether they are transmitted directly or after a personal copy is made? And why, if Aereo is right, could not modern CATV systems simply continue the same commercial and consumer-oriented activities, free of copyright restrictions, provided they substitute such new technologies for old? Congress would as much have intended to protect a copyright holder from the unlicensed activities of Aereo as from those of cable companies.

The text of the Clause effectuates Congress' intent. Aereo's argument to the contrary relies on the premise that "to transmit . . . a performance" means to make a single transmission. But the Clause suggests that an entity may transmit a performance through multiple, discrete transmissions. That is because one can "transmit" or "communicate" something through a *set* of actions. Thus one can transmit a message to one's friends, irrespective of whether one sends separate identical e-mails to each friend or a single e-mail to all at once. So can an elected official communicate an idea, slogan, or speech to her constituents, regardless of whether she communicates that idea, slogan, or speech during individual phone calls to each constituent or in a public square.

The fact that a singular noun ("a performance") follows the words "to transmit" does not suggest the contrary. One can sing a song to his family, whether he sings the same song one-on-one or in front of all together. Similarly, one's colleagues may watch a performance of a particular play—say, this season's modern-dress version of "Measure for Measure"—whether they do so at separate or at the same showings. By the same principle, an entity may transmit a performance through one or several transmissions, where the performance is of the same work.

The Transmit Clause must permit this interpretation, for it provides that one may transmit a performance to the public "whether the members of the public capable of

Opinion of the Court

receiving the performance . . . receive it . . . at the same time or at different times." §101. Were the words "to transmit . . . a performance" limited to a single act of communication, members of the public could not receive the performance communicated "at different times." Therefore, in light of the purpose and text of the Clause, we conclude that when an entity communicates the same contemporaneously perceptible images and sounds to multiple people, it transmits a performance to them regardless of the number of discrete communications it makes.

We do not see how the fact that Aereo transmits via personal copies of programs could make a difference. The Act applies to transmissions "by means of any device or process." *Ibid.* And retransmitting a television program using user-specific copies is a "process" of transmitting a performance. A "cop[y]" of a work is simply a "material objec[t] . . . in which a work is fixed . . . and from which the work can be perceived, reproduced, or otherwise communicated." *Ibid.* So whether Aereo transmits from the same or separate copies, it performs the same work; it shows the same images and makes audible the same sounds. Therefore, when Aereo streams the same television program to multiple subscribers, it "transmit[s] . . . a performance" to all of them.

Moreover, the subscribers to whom Aereo transmits television programs constitute "the public." Aereo communicates the same contemporaneously perceptible images and sounds to a large number of people who are unrelated and unknown to each other. This matters because, although the Act does not define "the public," it specifies that an entity performs publicly when it performs at "any place where a substantial number of persons outside of a normal circle of a family and its social acquaintances is gathered." *Ibid.* The Act thereby suggests that "the public" consists of a large group of people outside of a family

Cite as: 573 U. S. ____ (2014)        15

Opinion of the Court

and friends.

Neither the record nor Aereo suggests that Aereo's subscribers receive performances in their capacities as owners or possessors of the underlying works. This is relevant because when an entity performs to a set of people, whether they constitute "the public" often depends upon their relationship to the underlying work. When, for example, a valet parking attendant returns cars to their drivers, we would not say that the parking service provides cars "to the public." We would say that it provides the cars to their owners. We would say that a car dealership, on the other hand, does provide cars to the public, for it sells cars to individuals who lack a pre-existing relationship to the cars. Similarly, an entity that transmits a performance to individuals in their capacities as owners or possessors does not perform to "the public," whereas an entity like Aereo that transmits to large numbers of paying subscribers who lack any prior relationship to the works does so perform.

Finally, we note that Aereo's subscribers may receive the same programs at different times and locations. This fact does not help Aereo, however, for the Transmit Clause expressly provides that an entity may perform publicly "whether the members of the public capable of receiving the performance . . . receive it in the same place or in separate places and at the same time or at different times." *Ibid.* In other words, "the public" need not be situated together, spatially or temporally. For these reasons, we conclude that Aereo transmits a performance of petitioners' copyrighted works to the public, within the meaning of the Transmit Clause.

## IV

Aereo and many of its supporting *amici* argue that to apply the Transmit Clause to Aereo's conduct will impose copyright liability on other technologies, including new

technologies, that Congress could not possibly have wanted to reach. We agree that Congress, while intending the Transmit Clause to apply broadly to cable companies and their equivalents, did not intend to discourage or to control the emergence or use of different kinds of technologies. But we do not believe that our limited holding today will have that effect.

For one thing, the history of cable broadcast transmissions that led to the enactment of the Transmit Clause informs our conclusion that Aereo "perform[s]," but it does not determine whether different kinds of providers in different contexts also "perform." For another, an entity only transmits a performance when it communicates contemporaneously perceptible images and sounds of a work. See Brief for Respondent 31 ("[I]f a distributor . . . sells [multiple copies of a digital video disc] by mail to consumers, . . . [its] distribution of the DVDs merely makes it possible for the recipients to perform the work themselves—it is not a 'device or process' by which the *distributor* publicly performs the work" (emphasis in original)).

Further, we have interpreted the term "the public" to apply to a group of individuals acting as ordinary members of the public who pay primarily to watch broadcast television programs, many of which are copyrighted. We have said that it does not extend to those who act as owners or possessors of the relevant product. And we have not considered whether the public performance right is infringed when the user of a service pays primarily for something other than the transmission of copyrighted works, such as the remote storage of content. See Brief for United States as *Amicus Curiae* 31 (distinguishing cloud-based storage services because they "offer consumers more numerous and convenient means of playing back copies that the consumers have *already* lawfully acquired" (emphasis in original)). In addition, an entity does not trans-

mit to the public if it does not transmit to a substantial number of people outside of a family and its social circle.

We also note that courts often apply a statute's highly general language in light of the statute's basic purposes. Finally, the doctrine of "fair use" can help to prevent inappropriate or inequitable applications of the Clause. See *Sony Corp. of America* v. *Universal City Studios, Inc.*, 464 U. S. 417 (1984).

We cannot now answer more precisely how the Transmit Clause or other provisions of the Copyright Act will apply to technologies not before us. We agree with the Solicitor General that "[q]uestions involving cloud computing, [remote storage] DVRs, and other novel issues not before the Court, as to which 'Congress has not plainly marked [the] course,' should await a case in which they are squarely presented." Brief for United States as *Amicus Curiae* 34 (quoting *Sony, supra*, at 431 (alteration in original)). And we note that, to the extent commercial actors or other interested entities may be concerned with the relationship between the development and use of such technologies and the Copyright Act, they are of course free to seek action from Congress. Cf. Digital Millennium Copyright Act, 17 U. S. C. §512.

\*    \*    \*

In sum, having considered the details of Aereo's practices, we find them highly similar to those of the CATV systems in *Fortnightly* and *Teleprompter*. And those are activities that the 1976 amendments sought to bring within the scope of the Copyright Act. Insofar as there are differences, those differences concern not the nature of the service that Aereo provides so much as the technological manner in which it provides the service. We conclude that those differences are not adequate to place Aereo's activities outside the scope of the Act.

For these reasons, we conclude that Aereo "perform[s]"

Opinion of the Court

petitioners' copyrighted works "publicly," as those terms are defined by the Transmit Clause.  We therefore reverse the contrary judgment of the Court of Appeals, and we remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

SCALIA, J., dissenting

# SUPREME COURT OF THE UNITED STATES

———————

No. 13–461

———————

## AMERICAN BROADCASTING COMPANIES, INC., ET AL., PETITIONERS *v.* AEREO, INC., FKA BAMBOOM LABS, INC.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[June 25, 2014]

JUSTICE SCALIA, with whom JUSTICE THOMAS and JUSTICE ALITO join, dissenting.

This case is the latest skirmish in the long-running copyright battle over the delivery of television programming. Petitioners, a collection of television networks and affiliates (Networks), broadcast copyrighted programs on the public airwaves for all to see. Aereo, respondent, operates an automated system that allows subscribers to receive, on Internet-connected devices, programs that they select, including the Networks' copyrighted programs. The Networks sued Aereo for several forms of copyright infringement, but we are here concerned with a single claim: that Aereo violates the Networks' "exclusive righ[t]" to "perform" their programs "publicly." 17 U. S. C. §106(4). That claim fails at the very outset because Aereo does not "perform" at all. The Court manages to reach the opposite conclusion only by disregarding widely accepted rules for service-provider liability and adopting in their place an improvised standard ("looks-like-cable-TV") that will sow confusion for years to come.

### I. Legal Standard

There are two types of liability for copyright infringement: direct and secondary. As its name suggests, the

2        AMERICAN BROADCASTING COS. *v.* AEREO, INC.

SCALIA, J., dissenting

former applies when an actor personally engages in infringing conduct. See *Sony Corp. of America* v. *Universal City Studios, Inc.*, 464 U. S. 417, 433 (1984). Secondary liability, by contrast, is a means of holding defendants responsible for infringement by third parties, even when the defendants "have not themselves engaged in the infringing activity." *Id.*, at 435. It applies when a defendant "intentionally induc[es] or encourag[es]" infringing acts by others or profits from such acts "while declining to exercise a right to stop or limit [them]." *Metro-Goldwyn-Mayer Studios Inc.* v. *Grokster, Ltd.*, 545 U. S. 913, 930 (2005).

Most suits against equipment manufacturers and service providers involve secondary-liability claims. For example, when movie studios sued to block the sale of Sony's Betamax videocassette recorder (VCR), they argued that Sony was liable because *its customers* were making unauthorized copies. See *Sony*, *supra*, at 434–435. Record labels and movie studios relied on a similar theory when they sued Grokster and StreamCast, two providers of peer-to-peer file-sharing software. See *Grokster*, *supra*, at 920–921, 927.

This suit, or rather the portion of it before us here, is fundamentally different. The Networks claim that Aereo *directly* infringes their public-performance right. Accordingly, the Networks must prove that Aereo "perform[s]" copyrighted works, §106(4), when its subscribers log in, select a channel, and push the "watch" button. That process undoubtedly results in a performance; the question is *who* does the performing. See *Cartoon Network LP, LLLP* v. *CSC Holdings, Inc.*, 536 F. 3d 121, 130 (CA2 2008). If Aereo's subscribers perform but Aereo does not, the claim necessarily fails.

The Networks' claim is governed by a simple but profoundly important rule: A defendant may be held directly liable only if it has engaged in volitional conduct that violates the Act. See 3 W. Patry, Copyright §9:5.50 (2013).

SCALIA, J., dissenting

This requirement is firmly grounded in the Act's text, which defines "perform" in active, affirmative terms: One "perform[s]" a copyrighted "audiovisual work," such as a movie or news broadcast, by "show[ing] its images in any sequence" or "mak[ing] the sounds accompanying it audible." §101. And since the Act makes it unlawful to copy or perform copyrighted works, not to copy or perform in general, see §501(a), the volitional-act requirement demands conduct directed to the plaintiff's copyrighted material, see *Sony, supra,* at 434. Every Court of Appeals to have considered an automated-service provider's direct liability for copyright infringement has adopted that rule. See *Fox Broadcasting Co.* v. *Dish Network LLC*, 747 F. 3d 1060, 1066–1068 (CA9 2014); *Cartoon Network, supra,* at 130–131 (CA2 2008); *CoStar Group, Inc.* v. *LoopNet, Inc.*, 373 F. 3d 544, 549–550 (CA4 2004).[1] Although we have not opined on the issue, our cases are fully consistent with a volitional-conduct requirement. For example, we gave several examples of direct infringement in *Sony,* each of which involved a volitional act directed to the plaintiff's copyrighted material. See 464 U. S., at 437, n. 18.

The volitional-conduct requirement is not at issue in most direct-infringement cases; the usual point of dispute is whether the defendant's conduct is infringing (*e.g.,* Does the defendant's design copy the plaintiff's?), rather than whether the defendant has acted at all (*e.g.,* Did this defendant create the infringing design?). But it comes right to the fore when a direct-infringement claim is

---

[1] An unpublished decision of the Third Circuit is to the same effect. *Parker* v. *Google, Inc.*, 242 Fed. Appx. 833, 836–837 (2007) (*per curiam*).

The Networks muster only one case they say stands for a different approach, *New York Times Co.* v. *Tasini*, 533 U. S. 483 (2001). Reply Brief 18. But *Tasini* is clearly inapposite; it dealt with the question whether the defendants' copying was permissible, not whether the defendants were the ones who made the copies. See 533 U. S., at 487–488, 492, 504–506.

4        AMERICAN BROADCASTING COS. *v.* AEREO, INC.

SCALIA, J., dissenting

lodged against a defendant who does nothing more than operate an automated, user-controlled system. See, *e.g., Fox Broadcasting*, *supra*, at 1067; *Cartoon Network*, *supra*, at 131. Internet-service providers are a prime example. When one user sends data to another, the provider's equipment facilitates the transfer automatically. Does that mean that the provider is directly liable when the transmission happens to result in the "reproduc[tion]," §106(1), of a copyrighted work? It does not. The provider's system is "totally indifferent to the material's content," whereas courts require "some aspect of volition" directed at the copyrighted material before direct liability may be imposed. *CoStar*, 373 F. 3d, at 550–551.[2] The defendant may be held directly liable only if the defendant *itself* "trespassed on the exclusive domain of the copyright owner." *Id.,* at 550. Most of the time that issue will come down to who selects the copyrighted content: the defendant or its customers. See *Cartoon Network*, *supra,* at 131–132.

A comparison between copy shops and video-on-demand services illustrates the point. A copy shop rents out photocopiers on a per-use basis. One customer might copy his 10-year-old's drawings—a perfectly lawful thing to do—while another might duplicate a famous artist's copyrighted photographs—a use clearly prohibited by §106(1). Either way, *the customer* chooses the content and activates the copying function; the photocopier does nothing except in response to the customer's commands. Because the shop plays no role in selecting the content, it cannot be held directly liable when a customer makes an infringing copy. See *CoStar*, *supra,* at 550.

---

[2] Congress has enacted several safe-harbor provisions applicable to automated network processes, see, *e.g.,* 17 U. S. C. §512(a)–(b), but those provisions do not foreclose "any other defense," §512(*l*), including a volitional-conduct defense.

SCALIA, J., dissenting

Video-on-demand services, like photocopiers, respond automatically to user input, but they differ in one crucial respect: *They choose the content*. When a user signs in to Netflix, for example, "thousands of . . . movies [and] TV episodes" carefully curated by Netflix are "available to watch instantly." See How [D]oes Netflix [W]ork?, online at http://help.netflix.com/en/node/412 (as visited June 20, 2014, and available in Clerk of Court's case file). That selection and arrangement by the service provider constitutes a volitional act directed to specific copyrighted works and thus serves as a basis for direct liability.

The distinction between direct and secondary liability would collapse if there were not a clear rule for determining whether *the defendant* committed the infringing act. See *Cartoon Network*, 536 F. 3d, at 132–133. The volitional-conduct requirement supplies that rule; its purpose is not to excuse defendants from accountability, but to channel the claims against them into the correct analytical track. See Brief for 36 Intellectual Property and Copyright Law Professors as *Amici Curiae* 7. Thus, in the example given above, the fact that the copy shop does not choose the content simply means that its culpability will be assessed using secondary-liability rules rather than direct-liability rules. See *Sony*, *supra*, at 434–442; *Cartoon Network*, *supra*, at 132–133.

## II. Application to Aereo

So which is Aereo: the copy shop or the video-on-demand service? In truth, it is neither. Rather, it is akin to a copy shop that provides its patrons with a library card. Aereo offers access to an automated system consisting of routers, servers, transcoders, and dime-sized antennae. Like a photocopier or VCR, that system lies dormant until a subscriber activates it. When a subscriber selects a program, Aereo's system picks up the relevant broadcast signal, translates its audio and video components into

SCALIA, J., dissenting

digital data, stores the data in a user-specific file, and transmits that file's contents to the subscriber via the Internet—at which point the subscriber's laptop, tablet, or other device displays the broadcast just as an ordinary television would.  The result of that process fits the statutory definition of a performance to a tee: The subscriber's device "show[s]" the broadcast's "images" and "make[s] the sounds accompanying" the broadcast "audible." §101.  The only question is whether those performances are the product of Aereo's volitional conduct.

They are not.  Unlike video-on-demand services, Aereo does not provide a prearranged assortment of movies and television shows.  Rather, it assigns each subscriber an antenna that—like a library card—can be used to obtain whatever broadcasts are freely available.  Some of those broadcasts are copyrighted; others are in the public domain.  The key point is that subscribers call all the shots: Aereo's automated system does not relay any program, copyrighted or not, until a subscriber selects the program and tells Aereo to relay it.  Aereo's operation of that system is a volitional act and a but-for cause of the resulting performances, but, as in the case of the copy shop, that degree of involvement is not enough for direct liability. See *Grokster*, 545 U. S., at 960 (BREYER, J., concurring) ("[T]he producer of a technology which *permits* unlawful copying does not himself *engage* in unlawful copying").

In sum, Aereo does not "perform" for the sole and simple reason that it does not make the choice of content.  And because Aereo does not perform, it cannot be held directly liable for infringing the Networks' public-performance right.[3]  That conclusion does not necessarily mean that Aereo's service complies with the Copyright Act.  Quite the

---

[3]Because I conclude that Aereo does not perform at all, I do not reach the question whether the performances in this case are to the public. See *ante,* at 10–15.

SCALIA, J., dissenting

contrary. The Networks' complaint alleges that Aereo is directly *and* secondarily liable for infringing their public-performance rights (§106(4)) *and also* their reproduction rights (§106(1)). Their request for a preliminary injunction—the only issue before this Court—is based exclusively on the direct-liability portion of the public-performance claim (and further limited to Aereo's "watch" function, as opposed to its "record" function). See App. to Pet. for Cert. 60a–61a. Affirming the judgment below would merely return this case to the lower courts for consideration of the Networks' remaining claims.

### III. Guilt By Resemblance

The Court's conclusion that Aereo performs boils down to the following syllogism: (1) Congress amended the Act to overrule our decisions holding that cable systems do not perform when they retransmit over-the-air broadcasts;[4] (2) Aereo looks a lot like a cable system; therefore (3) Aereo performs. *Ante,* at 4–10. That reasoning suffers from a trio of defects.

First, it is built on the shakiest of foundations. Perceiving the text to be ambiguous, *ante,* at 4, the Court reaches out to decide the case based on a few isolated snippets of legislative history, *ante,* at 7–8 (citing H. R. Rep. No. 94–1476 (1976)). The Court treats those snippets as authoritative evidence of congressional intent even though they come from a single report issued by a committee whose members make up a small fraction of one of the two Houses of Congress. Little else need be said here about the severe shortcomings of that interpretative methodology. See *Lawson* v. *FMR LLC,* 571 U. S. ___, ___ (2014) (SCALIA, J., concurring in principal part and concurring in judgment) (slip op., at 1–2).

---

[4]See *Teleprompter Corp.* v. *Columbia Broadcasting System, Inc.,* 415 U. S. 394 (1974); *Fortnightly Corp.* v. *United Artists Television, Inc.,* 392 U. S. 390 (1968).

SCALIA, J., dissenting

Second, the Court's reasoning fails on its own terms because there are material differences between the cable systems at issue in *Teleprompter Corp.* v. *Columbia Broadcasting System, Inc.,* 415 U. S. 394 (1974), and *Fortnightly Corp.* v. *United Artists Television, Inc.,* 392 U. S. 390 (1968), on the one hand and Aereo on the other. The former (which were then known as community-antenna television systems) captured the full range of broadcast signals and forwarded them to all subscribers at all times, whereas Aereo transmits only specific programs selected by the user, at specific times selected by the user. The Court acknowledges this distinction but blithely concludes that it "does not make a critical difference." *Ante,* at 10. Even if that were true, the Court fails to account for other salient differences between the two technologies.[5] Though cable systems started out essentially as dumb pipes that routed signals from point A to point B, see *ante,* at 5, by the 1970's, that kind of service "'no longer exist[ed],'" Brief for Petitioners in *Columbia Broadcasting System, Inc.* v. *Teleprompter Corp.*, O. T. 1973, No. 72–1633, p. 22. At the time of our *Teleprompter* decision, cable companies "perform[ed] the same functions as 'broadcasters' by deliberately selecting and importing distant signals, originating programs, [and] selling commercials," *id.,* at 20, thus making them curators of content—more akin to video-on-demand services than copy shops. So far as the record reveals, Aereo does none of those things.

————————

[5]The Court observes that "[t]he subscribers of the *Fortnightly* and *Teleprompter* cable systems . . . selected what programs to display on their receiving sets," but acknowledges that those choices were possible only because "the television signals, in a sense, lurked behind the screen, ready to emerge when the subscriber turned the knob." *Ante,* at 10. The latter point is dispositive: The signals were "ready to emerge" because the cable system—much like a video-on-demand provider— took affirmative, volitional steps to *put* them there. As discussed above, the same cannot be said of the programs available through Aereo's automated system.

Third, and most importantly, even accepting that the 1976 amendments had as their purpose the overruling of our cable-TV cases, what they were meant to do and how they did it are two different questions—and it is the latter that governs the case before us here. The injury claimed is not violation of a law that says operations similar to cable TV are subject to copyright liability, but violation of §106(4) of the Copyright Act. And whatever soothing reasoning the Court uses to reach its result ("this looks like cable TV"), the consequence of its holding is that someone who implements this technology *"perform[s]" under that provision*. That greatly disrupts settled jurisprudence which, before today, applied the straightforward, bright-line test of volitional conduct directed at the copyrighted work. If that test is not outcome determinative in this case, presumably it is not outcome determinative elsewhere as well. And it is not clear what the Court proposes to replace it. Perhaps the Court means to adopt (invent, really) a two-tier version of the Copyright Act, one part of which applies to "cable companies and their equivalents" while the other governs everyone else. *Ante,* at 9–10, 16.

The rationale for the Court's ad hoc rule for cable-system lookalikes is so broad that it renders nearly a third of the Court's opinion superfluous. Part II of the opinion concludes that Aereo performs because it resembles a cable company, and Congress amended the Act in 1976 "to bring the activities of cable systems within [its] scope." *Ante,* at 8. Part III of the opinion purports to address separately the question whether Aereo performs "publicly." *Ante,* at 10–15. Trouble is, that question cannot remain open if Congress's supposed intent to regulate whatever looks like a cable company must be given legal effect (as the Court says in Part II). The Act reaches only public performances, see §106(4), so Congress could not have regulated "the activities of cable systems" without

SCALIA, J., dissenting

deeming their retransmissions public performances. The upshot is this: If Aereo's similarity to a cable company means that it performs, then by necessity that same characteristic means that it does so publicly, and Part III of the Court's opinion discusses an issue that is no longer relevant—though discussing it certainly gives the opinion the "feel" of real textual analysis.

Making matters worse, the Court provides no criteria for determining when its cable-TV-lookalike rule applies. Must a defendant offer access to live television to qualify? If similarity to cable-television service is the measure, then the answer must be yes. But consider the implications of that answer: Aereo would be free to do exactly what it is doing right now so long as it built mandatory time shifting into its "watch" function.[6] Aereo would not be providing *live* television if it made subscribers wait to tune in until after a show's live broadcast ended. A subscriber could watch the 7 p.m. airing of a 1-hour program any time after 8 p.m. Assuming the Court does not intend to adopt such a do-nothing rule (though it very well may), there must be some other means of identifying who is and is not subject to its guilt-by-resemblance regime.

Two other criteria come to mind. One would cover any automated service that captures and stores live television broadcasts at a user's direction. That can't be right, since it is exactly what remote storage digital video recorders (RS–DVRs) do, see *Cartoon Network*, 536 F. 3d, at 124–125, and the Court insists that its "limited holding" does not decide the fate of those devices, *ante,* at 16–17. The other potential benchmark is the one offered by the Government: The cable-TV-lookalike rule embraces any entity

---

[6] Broadcasts accessible through the "watch" function are technically not live because Aereo's servers take anywhere from a few seconds to a few minutes to begin transmitting data to a subscriber's device. But the resulting delay is so brief that it cannot reasonably be classified as time shifting.

SCALIA, J., dissenting

that "operates an integrated system, substantially dependent on physical equipment that is used in common by [its] subscribers." Brief for United States as *Amicus Curiae* 20. The Court sensibly avoids that approach because it would sweep in Internet service providers and a host of other entities that quite obviously do not perform.

That leaves as the criterion of cable-TV-resemblance nothing but th'ol' totality-of-the-circumstances test (which is not a test at all but merely assertion of an intent to perform test-free, ad hoc, case-by-case evaluation). It will take years, perhaps decades, to determine which automated systems now in existence are governed by the traditional volitional-conduct test and which get the Aereo treatment. (And automated systems now in contemplation will have to take their chances.) The Court vows that its ruling will not affect cloud-storage providers and cable-television systems, see *ante,* at 16–17, but it cannot deliver on that promise given the imprecision of its result-driven rule. Indeed, the difficulties inherent in the Court's makeshift approach will become apparent in this very case. Today's decision addresses the legality of Aereo's "watch" function, which provides nearly contemporaneous access to live broadcasts. On remand, one of the first questions the lower courts will face is whether Aereo's "record" function, which allows subscribers to save a program while it is airing and watch it later, infringes the Networks' public-performance right. The volitional-conduct rule provides a clear answer to that question: Because Aereo does not select the programs viewed by its users, it does not perform. But it is impossible to say how the issue will come out under the Court's analysis, since cable companies did not offer remote recording and playback services when Congress amended the Copyright Act in 1976.

12    AMERICAN BROADCASTING COS. *v.* AEREO, INC.

SCALIA, J., dissenting

\*    \*    \*

I share the Court's evident feeling that what Aereo is doing (or enabling to be done) to the Networks' copyrighted programming ought not to be allowed. But perhaps we need not distort the Copyright Act to forbid it. As discussed at the outset, Aereo's secondary liability for performance infringement is yet to be determined, as is its primary and secondary liability for reproduction infringement. If that does not suffice, then (assuming one shares the majority's estimation of right and wrong) what we have before us must be considered a "loophole" in the law. It is not the role of this Court to identify and plug loopholes. It is the role of good lawyers to identify and exploit them, and the role of Congress to eliminate them if it wishes. Congress can do that, I may add, in a much more targeted, better informed, and less disruptive fashion than the crude "looks-like-cable-TV" solution the Court invents today.

We came within one vote of declaring the VCR contraband 30 years ago in *Sony*. See 464 U. S., at 441, n. 21. The dissent in that case was driven in part by the plaintiffs' prediction that VCR technology would wreak all manner of havoc in the television and movie industries. See *id.*, at 483 (opinion of Blackmun, J.); see also Brief for CBS, Inc., as *Amicus Curiae*, O. T. 1982, No. 81–1687, p. 2 (arguing that VCRs "directly threatened" the bottom line of "[e]very broadcaster").

The Networks make similarly dire predictions about Aereo. We are told that nothing less than "the very existence of broadcast television as we know it" is at stake. Brief for Petitioners 39. Aereo and its *amici* dispute those forecasts and make a few of their own, suggesting that a decision in the Networks' favor will stifle technological innovation and imperil billions of dollars of investments in cloud-storage services. See Brief for Respondents 48–51; Brief for BSA, The Software Alliance as *Amicus Curiae* 5–

Scalia, J., dissenting

13. We are in no position to judge the validity of those
self-interested claims or to foresee the path of future
technological development. See *Sony*, *supra*, at 430–431;
see also *Grokster*, 545 U. S., at 958 (Breyer, J., concur-
ring). Hence, the proper course is not to bend and twist
the Act's terms in an effort to produce a just outcome, but
to apply the law as it stands and leave to Congress the
task of deciding whether the Copyright Act needs an
upgrade. I conclude, as the Court concluded in *Sony*: "It
may well be that Congress will take a fresh look at this
new technology, just as it so often has examined other
innovations in the past. But it is not our job to apply laws
that have not yet been written. Applying the copyright
statute, as it now reads, to the facts as they have been
developed in this case, the judgment of the Court of Ap-
peals must be [affirmed]." 464 U. S., at 456.

I respectfully dissent.